STEWART ET AL. *v.* ABEND, DBA AUTHORS
RESEARCH CO.

No. 88–2102.   Argued January 9, 1990—Decided April 24, 1990

208

O'CONNOR, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and KENNEDY, JJ., joined. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 238. STEVENS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 239.

*Louis P. Petrich* argued the cause for petitioners. With him on the briefs was *Gary L. Swingle.*

*Peter J. Anderson* argued the cause for respondent. With him on the briefs was *James P. Tierney.*\*

JUSTICE O'CONNOR delivered the opinion of the Court.

The author of a pre-existing work may assign to another the right to use it in a derivative work. In this case the author of a pre-existing work agreed to assign the rights in his renewal copyright term to the owner of a derivative work, but died before the commencement of the renewal period. The question presented is whether the owner of the derivative work infringed the rights of the successor owner of the pre-existing work by continued distribution and publication of the derivative work during the renewal term of the pre-existing work.

I

Cornell Woolrich authored the story "It Had to Be Murder," which was first published in February 1942 in Dime Detective Magazine. The magazine's publisher, Popular Publications, Inc., obtained the rights to magazine publication of the story and Woolrich retained all other rights. Popular Publications obtained a blanket copyright for the issue of Dime Detective Magazine in which "It Had to Be Murder" was published.

---

\**Stephen A. Kroft* filed a brief for Columbia Pictures Industries, Inc., et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Register of Copyrights by *Dorothy Schrader, Ralph Oman,* and *William J. Roberts, Jr.;* for the Committee for Literary Property Studies by *Irwin Karp* and *Barbara Ringer;* and for the Songwriters Guild of America by *David Blasband.*

The Copyright Act of 1909 (1909 Act), 35 Stat. 1075, 17 U. S. C. § 1 *et seq.* (1976 ed.), provided authors a 28-year initial term of copyright protection plus a 28-year renewal term. See 17 U. S. C. § 24 (1976 ed.). In 1945, Woolrich agreed to assign the rights to make motion picture versions of six of his stories, including "It Had to Be Murder," to B. G. De Sylva Productions for $9,250. He also agreed to renew the copyrights in the stories at the appropriate time and to assign the same motion picture rights to De Sylva Productions for the 28-year renewal term. In 1953, actor Jimmy Stewart and director Alfred Hitchcock formed a production company, Patron, Inc., which obtained the motion picture rights in "It Had to Be Murder" from De Sylva's successors in interest for $10,000.

In 1954, Patron, Inc., along with Paramount Pictures, produced and distributed "Rear Window," the motion picture version of Woolrich's story "It Had to Be Murder." Woolrich died in 1968 before he could obtain the rights in the renewal term for petitioners as promised and without a surviving spouse or child. He left his property to a trust administered by his executor, Chase Manhattan Bank, for the benefit of Columbia University. On December 29, 1969, Chase Manhattan Bank renewed the copyright in the "It Had to Be Murder" story pursuant to 17 U. S. C. § 24 (1976 ed.). Chase Manhattan assigned the renewal rights to respondent Abend for $650 plus 10% of all proceeds from exploitation of the story.

"Rear Window" was broadcast on the ABC television network in 1971. Respondent then notified petitioners Hitchcock (now represented by cotrustees of his will), Stewart, and MCA Inc., the owners of the "Rear Window" motion picture and renewal rights in the motion picture, that he owned the renewal rights in the copyright and that their distribution of the motion picture without his permission infringed his copyright in the story. Hitchcock, Stewart, and MCA nonetheless entered into a second license with ABC to rebroad-

cast the motion picture. In 1974, respondent filed suit against these same petitioners, and others, in the United States District Court for the Southern District of New York, alleging copyright infringement. Respondent dismissed his complaint in return for $25,000.

Three years later, the United States Court of Appeals for the Second Circuit decided *Rohauer* v. *Killiam Shows, Inc.*, 551 F. 2d 484, cert. denied, 431 U. S. 949 (1977), in which it held that the owner of the copyright in a derivative work[1] may continue to use the existing derivative work according to the original grant from the author of the pre-existing work even if the grant of rights in the pre-existing work lapsed. 551 F. 2d, at 494. Several years later, apparently in reliance on *Rohauer*, petitioners re-released the motion picture in a variety of media, including new 35 and 16 millimeter prints for theatrical exhibition in the United States, videocassettes, and videodiscs. They also publicly exhibited the motion picture in theaters, over cable television, and through videodisc and videocassette rentals and sales.

Respondent then brought the instant suit in the United States District Court for the Central District of California against Hitchcock, Stewart, MCA, and Universal Film Exchanges, a subsidiary of MCA and the distributor of the motion picture. Respondent's complaint alleges that the re-release of the motion picture infringes his copyright in the story because petitioners' right to use the story during the renewal term lapsed when Woolrich died before he could register for the renewal term and transfer his renewal rights to them. Respondent also contends that petitioners have interfered with his rights in the renewal term of the story in other ways. He alleges that he sought to contract with Home Box

---

[1] The Copyright Act of 1976 (1976 Act), 17 U. S. C. § 101 *et seq.* (1988 ed.), codified the definition of a " 'derivative work' " as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version . . . or any other form in which a work may be recast, transformed, or adapted." § 101.

Office (HBO) to produce a play and television version of the story, but that petitioners wrote to him and HBO stating that neither he nor HBO could use either the title, "Rear Window" or "It Had to Be Murder." Respondent also alleges that petitioners further interfered with the renewal copyright in the story by attempting to sell the right to make a television sequel and that the re-release of the original motion picture itself interfered with his ability to produce other derivative works.

Petitioners filed motions for summary judgment, one based on the decision in *Rohauer*, *supra*, and the other based on alleged defects in the story's copyright. Respondent moved for summary judgment on the ground that petitioners' use of the motion picture constituted copyright infringement. Petitioners responded with a third motion for summary judgment based on a "fair use" defense. The District Court granted petitioners' motions for summary judgment based on *Rohauer* and the fair use defense and denied respondent's motion for summary judgment, as well as petitioners' motion for summary judgment alleging defects in the story's copyright. Respondent appealed to the United States Court of Appeals for the Ninth Circuit and petitioners cross-appealed.

The Court of Appeals reversed, holding that respondent's copyright in the renewal term of the story was not defective. *Abend* v. *MCA, Inc.*, 863 F. 2d 1465, 1472 (1988). The issue before the court, therefore, was whether petitioners were entitled to distribute and exhibit the motion picture without respondent's permission despite respondent's valid copyright in the pre-existing story. Relying on the renewal provision of the 1909 Act, 17 U. S. C. § 24 (1976 ed.), respondent argued before the Court of Appeals that because he obtained from Chase Manhattan Bank, the statutory successor, the renewal right free and clear of any purported assignments of any interest in the renewal copyright, petitioners' distribution and publication of "Rear Window" without authorization infringed his renewal copyright. Petitioners responded that

they had the right to continue to exploit "Rear Window" during the 28-year renewal period because Woolrich had agreed to assign to petitioners' predecessor in interest the motion picture rights in the story for the renewal period.

Petitioners also relied, as did the District Court, on the decision in *Rohauer* v. *Killiam Shows, Inc., supra.* In *Rohauer*, the Court of Appeals for the Second Circuit held that statutory successors to the renewal copyright in a pre-existing work under § 24 could not "depriv[e] the proprietor of the derivative copyright of a right . . . to use so much of the underlying copyrighted work as already has been embodied in the copyrighted derivative work, as a matter of copyright law." *Id.*, at 492. The Court of Appeals in the instant case rejected this reasoning, concluding that even if the pre-existing work had been incorporated into a derivative work, use of the pre-existing work was infringing unless the owner of the derivative work held a valid grant of rights in the renewal term.

The court relied on *Miller Music Corp.* v. *Charles N. Daniels, Inc.*, 362 U. S. 373 (1960), in which we held that assignment of renewal rights by an author before the time for renewal arrives cannot defeat the right of the author's statutory successor to the renewal rights if the author dies before the right to renewal accrues. An assignee of the renewal rights takes only an expectancy: "Until [the time for registration of renewal rights] arrives, assignees of renewal rights take the risk that the rights acquired may never vest in their assignors. A purchaser of such an interest is deprived of nothing. Like all purchasers of contingent interests, he takes subject to the possibility that the contingency may not occur." *Id.*, at 378. The Court of Appeals reasoned that "[i]f *Miller Music* makes assignment of the full renewal rights in the underlying copyright unenforceable when the author dies before effecting renewal of the copyright, then, *a fortiori*, an assignment of part of the rights in the underlying work, the right to produce a movie version, must

also be unenforceable if the author dies before effecting renewal of the underlying copyright." 863 F. 2d, at 1476. Finding further support in the legislative history of the 1909 Act and rejecting the *Rohauer* court's reliance on the equities and the termination provisions of the 1976 Act, 17 U. S. C. §§ 203(b)(1), 304(c)(6)(A), the Court of Appeals concluded that petitioners received from Woolrich only an expectancy in the renewal rights that never matured; upon Woolrich's death, Woolrich's statutory successor, Chase Manhattan Bank, became "entitled to a renewal and extension of the copyright," which Chase Manhattan secured "within one year prior to the expiration of the original term of copyright." 17 U. S. C. § 24 (1976 ed.). Chase Manhattan then assigned the existing rights in the copyright to respondent.

The Court of Appeals also addressed at length the proper remedy, an issue not relevant to the issue on which we granted certiorari. We granted certiorari to resolve the conflict between the decision in *Rohauer, supra,* and the decision below. 493 U. S. 807 (1989). Petitioners do not challenge the Court of Appeals' determination that respondent's copyright in the renewal term is valid, and we express no opinion regarding the Court of Appeals' decision on this point.

## II

### A

Petitioners would have us read into the Copyright Act a limitation on the statutorily created rights of the owner of an underlying work. They argue in essence that the rights of the owner of the copyright in the derivative use of the pre-existing work are extinguished once it is incorporated into the derivative work, assuming the author of the pre-existing work has agreed to assign his renewal rights. Because we find no support for such a curtailment of rights in either the 1909 Act or the 1976 Act, or in the legislative history of either, we affirm the judgment of the Court of Appeals.

Petitioners and *amicus* Register of Copyrights assert, as the Court of Appeals assumed, that § 23 of the 1909 Act, 17 U. S. C. § 24 (1976 ed.), and the case law interpreting that provision, directly control the disposition of this case. Respondent counters that the provisions of the 1976 Act control, but that the 1976 Act re-enacted § 24 in § 304 and, therefore, the language and judicial interpretation of § 24 are relevant to our consideration of this case. Under either theory, we must look to the language of and case law interpreting § 24.

The right of renewal found in § 24 provides authors a second opportunity to obtain remuneration for their works. Section 24 provides:

> "[T]he author of [a copyrighted] work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright." 17 U. S. C. § 24 (1976 ed.)

Since the earliest copyright statute in this country, the copyright term of ownership has been split between an original term and a renewal term. Originally, the renewal was intended merely to serve as an extension of the original term; at the end of the original term, the renewal could be effected and claimed by the author, if living, or by the author's executors, administrators, or assigns. See Copyright Act of May 31, 1790, ch. XV, § 1, 1 Stat. 124. In 1831, Congress altered the provision so that the author could assign his contingent interest in the renewal term, but could not, through his assignment, divest the rights of his widow or children in the renewal term. See Copyright Act of February 3, 1831, ch. XVI, 4 Stat. 436; see also G. Curtis, Law of Copyright 235

(1847). The 1831 renewal provisions created "an entirely new policy, completely dissevering the title, breaking up the continuance . . . and vesting an absolutely new title eo nomine in the persons designated." *White-Smith Music Publishing Co.* v. *Goff*, 187 F. 247, 250 (CA1 1911). In this way, Congress attempted to give the author a second chance to control and benefit from his work. Congress also intended to secure to the author's family the opportunity to exploit the work if the author died before he could register for the renewal term. See Bricker, Renewal and Extension of Copyright, 29 S. Cal. L. Rev. 23, 27 (1955) ("The renewal term of copyright is the law's second chance to the author and his family to profit from his mental labors"). "The evident purpose of [the renewal provision] is to provide for the family of the author after his death. Since the author cannot assign his family's renewal rights, [it] takes the form of a compulsory bequest of the copyright to the designated persons." *De Sylva* v. *Ballentine*, 351 U. S. 570, 582 (1956). See *Fred Fisher Music Co.* v. *M. Witmark & Sons*, 318 U. S. 643, 651 (1943) (if at the end of the original copyright period, the author is not living, "his family stand[s] in more need of the only means of subsistence ordinarily left to them" (citation omitted)).

In its debates leading up to the Copyright Act of 1909, Congress elaborated upon the policy underlying a system comprised of an original term and a completely separate renewal term. See *G. Ricordi & Co.* v. *Paramount Pictures, Inc.*, 189 F. 2d 469, 471 (CA2) (the renewal right "creates a new estate, and the . . . cases which have dealt with the subject assert that the new estate is clear of all rights, interests or licenses granted under the original copyright"), cert. denied, 342 U. S. 849 (1951). "It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum." H. R. Rep. No. 2222, 60th Cong., 2d Sess., 14 (1909). The renewal term permits the author, originally in a poor bargaining position, to renegoti-

ate the terms of the grant once the value of the work has been tested. "[U]nlike real property and other forms of personal property, [a copyright] is by its very nature incapable of accurate monetary evaluation prior to its exploitation." 2 M. Nimmer & D. Nimmer, Nimmer on Copyright § 9.02, p. 9–23 (1989) (hereinafter Nimmer). "If the work proves to be a great success and lives beyond the term of twenty-eight years, . . . it should be the exclusive right of the author to take the renewal term, and the law should be framed . . . so that [the author] could not be deprived of that right." H. R. Rep. No. 2222, *supra,* at 14. With these purposes in mind, Congress enacted the renewal provision of the Copyright Act of 1909, 17 U. S. C. § 24 (1976 ed.). With respect to works in their original or renewal term as of January 1, 1978, Congress retained the two-term system of copyright protection in the 1976 Act. See 17 U. S. C. §§ 304(a) and (b) (1988 ed.) (incorporating language of 17 U. S. C. § 24 (1976 ed.)).

Applying these principles in *Miller Music Corp.* v. *Charles N. Daniels, Inc.,* 362 U. S. 373 (1960), this Court held that when an author dies before the renewal period arrives, his executor is entitled to the renewal rights, even though the author previously assigned his renewal rights to another party. "An assignment by an author of his renewal rights made before the original copyright expires is valid against the world, if the author is alive at the commencement of the renewal period. *[Fred] Fisher Co.* v. *[M.] Witmark & Sons,* 318 U. S. 643, so holds." *Id.,* at 375. If the author dies before that time, the "next of kin obtain the renewal copyright free of any claim founded upon an assignment made by the author in his lifetime. These results follow not because the author's assignment is invalid but because he had only an expectancy to assign; and his death, prior to the renewal period, terminates his interest in the renewal which by § 24 vests in the named classes." *Ibid.* The legislative history of the 1909 Act echoes this view: "The right of renewal is contingent. It does not vest until the end [of the original term].

If [the author] is alive at the time of renewal, then the original contract may pass it, but his widow or children or other persons entitled would not be bound by that contract." 5 Legislative History of the 1909 Copyright Act, Part K, p. 77 (E. Brylawski & A. Goldman eds. 1976) (statement of Mr. Hale).[2]  Thus, the renewal provisions were intended to give the author a second chance to obtain fair remuneration for his creative efforts and to provide the author's family a "new estate" if the author died before the renewal period arrived.

An author holds a bundle of exclusive rights in the copyrighted work, among them the right to copy and the right to incorporate the work into derivative works.[3]  By assigning the renewal copyright in the work without limitation, as in *Miller Music*, the author assigns all of these rights.  After *Miller Music*, if the author dies before the commencement of the renewal period, the assignee holds nothing.  If the assignee of all of the renewal rights holds nothing upon the death of the assignor before arrival of the renewal period,

---

[2] Neither *Miller Music* nor *Fred Fisher* decided the question of when the renewal rights vest, *i. e.*, whether the renewal rights vest upon commencement of the registration period, registration, or the date on which the original term expires and the renewal term begins.  We have no occasion to address the issue here.

[3] Title 17 U. S. C. § 106 codifies the various rights a copyright holder possesses: "[T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

"(1) to reproduce the copyrighted work in copies or phonorecords;

"(2) to prepare derivative works based upon the copyrighted work;

"(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

"(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

"(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly."

then, *a fortiori*, the assignee of a portion of the renewal rights, *e. g.*, the right to produce a derivative work, must also hold nothing. See also Brief for Register of Copyrights as *Amicus Curiae* 22 ("*[A]ny* assignment of renewal rights made during the original term is void if the author dies before the renewal period"). Therefore, if the author dies before the renewal period, then the assignee may continue to use the original work only if the author's successor transfers the renewal rights to the assignee. This is the rule adopted by the Court of Appeals below and advocated by the Register of Copyrights. See 863 F. 2d, at 1478; Brief for Register of Copyrights as *Amicus Curiae* 22. Application of this rule to this case should end the inquiry. Woolrich died before the commencement of the renewal period in the story, and, therefore, petitioners hold only an unfulfilled expectancy. Petitioners have been "deprived of nothing. Like all purchasers of contingent interests, [they took] subject to the possibility that the contingency may not occur." *Miller Music, supra,* at 378.

### B

The reason that our inquiry does not end here, and that we granted certiorari, is that the Court of Appeals for the Second Circuit reached a contrary result in *Rohauer* v. *Killiam Shows, Inc.*, 551 F. 2d 484 (1977). Petitioners' theory is drawn largely from *Rohauer*. The Court of Appeals. in *Rohauer* attempted to craft a "proper reconciliation" between the owner of the pre-existing work, who held the right to the work pursuant to *Miller Music*, and the owner of the derivative work, who had a great deal to lose if the work could not be published or distributed. 551 F. 2d, at 490. Addressing a case factually similar to this case, the court concluded that even if the death of the author caused the renewal rights in the pre-existing work to revert to the statutory successor, the owner of the derivative work could continue to exploit that work. The court reasoned that the 1976 Act and the relevant precedents did not preclude such a re-

sult and that it was necessitated by a balancing of the equities:

> "[T]he equities lie preponderantly in favor of the proprietor of the derivative copyright. In contrast to the situation where an assignee or licensee has done nothing more than print, publicize and distribute a copyrighted story or novel, a person who with the consent of the author has created an opera or a motion picture film will often have made contributions literary, musical and economic, as great as or greater than the original author. . . . [T]he purchaser of derivative rights has no truly effective way to protect himself against the eventuality of the author's death before the renewal period since there is no way of telling who will be the surviving widow, children or next of kin or the executor until that date arrives." *Id.*, at 493.

The Court of Appeals for the Second Circuit thereby shifted the focus from the right to use the pre-existing work in a derivative work to a right inhering in the created derivative work itself. By rendering the renewal right to use the original work irrelevant, the court created an exception to our ruling in *Miller Music* and, as petitioners concede, created an "intrusion" on the statutorily created rights of the owner of the pre-existing work in the renewal term. Brief for Petitioners 33.

Though petitioners do not, indeed could not, argue that its language expressly supports the theory they draw from *Rohauer*, they implicitly rely on § 6 of the 1909 Act, 17 U. S. C. § 7 (1976 ed.), which states that "dramatizations . . . of copyrighted works when produced with the consent of the proprietor of the copyright in such works . . . shall be regarded as new works subject to copyright under the provisions of this title." Petitioners maintain that the creation of the "new," *i. e.*, derivative, work extinguishes any right the owner of rights in the pre-existing work might have had to sue for infringement that occurs during the renewal term.

We think, as stated in Nimmer, that "[t]his conclusion is neither warranted by any express provision of the Copyright Act, nor by the rationale as to the scope of protection achieved in a derivative work. It is moreover contrary to the axiomatic copyright principle that a person may exploit only such copyrighted literary material as he either owns or is licensed to use." 1 Nimmer § 3.07[A], pp. 3–23 to 3–24 (footnotes omitted). The aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work. See *Russell* v. *Price*, 612 F. 2d 1123, 1128 (CA9 1979) (reaffirming "well-established doctrine that a derivative copyright protects only the new material contained in the derivative work, not the matter derived from the underlying work"), cert. denied, 446 U. S. 952 (1980); see also *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 539, 547 (1985) ("The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality"). So long as the pre-existing work remains out of the public domain, its use is infringing if one who employs the work does not have a valid license or assignment for use of the pre-existing work. *Russell* v. *Price, supra,* at 1128 ("[E]stablished doctrine prevents unauthorized copying or other infringing use of the underlying work or any part of that work contained in the derivative product so long as the underlying work itself remains copyrighted"). It is irrelevant whether the pre-existing work is inseparably intertwined with the derivative work. See *Gilliam* v. *American Broadcasting Cos.*, 538 F. 2d 14, 20 (CA2 1976) ("[C]opyright in the underlying script survives intact despite the incorporation of that work into a derivative work"). Indeed, the plain language of § 7 supports the view that the full force of the copyright in the pre-existing work is preserved despite incorporation into the derivative work. See 17 U. S. C. § 7 (1976 ed.) (publication of the derivative work "shall not affect the force or validity of

any subsisting copyright upon the matter employed"); see also 17 U. S. C. § 3 (1976 ed.) (copyright protection of a work extends to "all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright"). This well-settled rule also was made explicit in the 1976 Act:

"The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the pre-existing material." 17 U. S. C. § 103(b).

See also B. Ringer, Renewal of Copyright (1960), reprinted as Copyright Law Revision Study No. 31, prepared for the Senate Committee on the Judiciary, 86th Cong., 2d. Sess., 169–170 (1961) ("[O]n the basis of judicial authority, legislative history, and the opinions of the commentators, . . . someone cannot avoid his obligations to the owner of a renewal copyright merely because he created and copyrighted a 'new version' under a license or assignment which terminated at the end of the first term") (footnotes omitted).

Properly conceding there is no explicit support for their theory in the 1909 Act, its legislative history, or the case law, petitioners contend, as did the court in *Rohauer*, that the termination provisions of the 1976 Act, while not controlling, support their theory of the case. For works existing in their original or renewal terms as of January 1, 1978, the 1976 Act added 19 years to the 1909 Act's provision of 28 years of initial copyright protection and 28 years of renewal protection. See 17 U. S. C. §§ 304(a) and (b). For those works, the author has the power to terminate the grant of rights at the end of the renewal term and, therefore, to gain the benefit of that additional 19 years of protection. See

§ 304(c). In effect, the 1976 Act provides a third opportunity for the author to benefit from a work in its original or renewal term as of January 1, 1978. Congress, however, created one exception to the author's right to terminate: The author may not, at the end of the renewal term, terminate the right to use a derivative work for which the owner of the derivative work has held valid rights in the original and renewal terms. See § 304(c)(6)(A). The author, however, may terminate the right to create new derivative works. *Ibid.* For example, if petitioners held a valid copyright in the story throughout the original and renewal terms, and the renewal term in "Rear Window" were about to expire, petitioners could continue to distribute the motion picture even if respondent terminated the grant of rights, but could not create a new motion picture version of the story. Both the court in *Rohauer* and petitioners infer from this exception to the right to terminate an intent by Congress to prevent authors of pre-existing works from blocking distribution of derivative works. In other words, because Congress decided not to permit authors to exercise a third opportunity to benefit from a work incorporated into a derivative work, the Act expresses a general policy of undermining the author's second opportunity. We disagree.

The process of compromise between competing special interests leading to the enactment of the 1976 Act undermines any such attempt to draw an overarching policy out of § 304(c)(6)(A), which only prevents termination with respect to works in their original or renewal copyright terms as of January 1, 1978, and only at the end of the renewal period. See Ringer, First Thoughts on the Copyright Act of 1976, 13 Copyright 187, 188–189 (1977) (each provision of 1976 Act was drafted through series of compromises between interested parties). More specifically, § 304(c)

"was part of a compromise package involving the controversial and intertwined issues of initial ownership, duration of copyright, and reversion of rights. The Regis-

ter, convinced that the opposition . . . would scuttle the proposed legislation, drafted a number of alternative proposals. . . .

"Finally, the Copyright Office succeeded in urging negotiations among representatives of authors, composers, book and music publishers, and motion picture studios that produced a compromise on the substance and language of several provisions.

.        .         .           .              .

"Because the controversy surrounding the provisions disappeared once the parties reached a compromise, however, Congress gave the provisions little or no detailed consideration. . . . Thus, there is no evidence whatsoever of what members of Congress believed the language to mean."   Litman, Copyright, Compromise, and Legislative History, 72 Cornell L. Rev. 857, 865–868 (1987) (footnotes omitted).

In fact, if the 1976 Act's termination provisions provide any guidance at all in this case, they tilt against petitioners' theory.   The plain language of the termination provision itself indicates that Congress assumed that the owner of the pre-existing work possessed the right to sue for infringement even after incorporation of the pre-existing work in the derivative work.

"A derivative work *prepared* under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant." § 304(c)(6)(A) (emphasis added).

Congress would not have stated explicitly in § 304(c)(6)(A) that, at the end of the renewal term, the owner of the rights in the pre-existing work may not terminate use rights in existing derivative works unless Congress had assumed that

the owner continued to hold the right to sue for infringement even after incorporation of the pre-existing work into the derivative work. Cf. *Mills Music, Inc.* v. *Snyder*, 469 U. S. 153, 164 (1985) (§ 304(c)(6)(A) "carves out an exception from the reversion of rights that takes place when an author exercises his right to termination").

Accordingly, we conclude that neither the 1909 Act nor the 1976 Act provides support for the theory set forth in *Rohauer*. And even if the theory found some support in the statute or the legislative history, the approach set forth in *Rohauer* is problematic. Petitioners characterize the result in *Rohauer* as a bright-line "rule." The Court of Appeals in *Rohauer*, however, expressly implemented policy considerations as a means of reconciling what it viewed as the competing interests in that case. See 551 F. 2d, at 493–494. While the result in *Rohauer* might make some sense in some contexts, it makes no sense in others. In the case of a condensed book, for example, the contribution by the derivative author may be little, while the contribution by the original author is great. Yet, under the *Rohauer* "rule," publication of the condensed book would not infringe the pre-existing work even though the derivative author has no license or valid grant of rights in the pre-existing work. See Brief for Committee for Literary Property Studies as *Amicus Curiae* 29–31; see also Brief for Songwriters Guild of America as *Amicus Curiae* 11–12 (policy reasons set forth in *Rohauer* make little sense when applied to musical compositions). Thus, even if the *Rohauer* "rule" made sense in terms of policy in that case, it makes little sense when it is applied across the derivative works spectrum. Indeed, in the view of the commentators, *Rohauer* did not announce a "rule," but rather an "interest-balancing approach." See Jaszi, When Works Collide: Derivative Motion Pictures, Underlying Rights, and the Public Interest, 28 UCLA L. Rev. 715, 758–761 (1981); Note, Derivative Copyright and the 1909

Act—New Clarity or Confusion?, 44 Brooklyn L. Rev. 905, 926–927 (1978).

Finally, petitioners urge us to consider the policies underlying the Copyright Act. They argue that the rule announced by the Court of Appeals will undermine one of the policies of the Act—the dissemination of creative works—by leading to many fewer works reaching the public. *Amicus* Columbia Pictures asserts that "[s]ome owners of underlying work renewal copyrights may refuse to negotiate, preferring instead to retire their copyrighted works, and all derivative works based thereon, from public use. Others may make demands—like respondent's demand for 50% of petitioners' future gross proceeds in excess of advertising expenses . . .— which are so exorbitant that a negotiated economic accommodation will be impossible." Brief for Columbia Pictures et al. as *Amici Curiae* 21. These arguments are better addressed by Congress than the courts.

In any event, the complaint that respondent's monetary request in this case is so high as to preclude agreement fails to acknowledge that an initially high asking price does not preclude bargaining. Presumably, respondent is asking for a share in the proceeds because he wants to profit from the distribution of the work, not because he seeks suppression of it.

Moreover, although dissemination of creative works is a goal of the Copyright Act, the Act creates a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works. The copyright term is limited so that the public will not be permanently deprived of the fruits of an artist's labors. See *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417, 429 (1984) (the limited monopoly conferred by the Copyright Act "is intended to motivate creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired"). But nothing in the copyright statutes would

prevent an author from hoarding all of his works during the term of the copyright. In fact, this Court has held that a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work. See *Fox Film Corp.* v. *Doyal*, 286 U. S. 123, 127 (1932).

The limited monopoly granted to the artist is intended to provide the necessary bargaining capital to garner a fair price for the value of the works passing into public use. See *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U. S., at 546 ("The rights conferred by copyright are designed to assure contributors to the store of knowledge a fair return for their labors"); Register of Copyrights, Copyright Law Revision, 87th Cong., 1st Sess., 6 (Comm. Print 1961) ("While some limitations and conditions on copyright are essential in the public interest, they should not be so burdensome and strict as to deprive authors of their just reward. . . . [T]heir rights should be broad enough to give them a fair share of the revenue to be derived from the market for their works"). When an author produces a work which later commands a higher price in the market than the original bargain provided, the copyright statute is designed to provide the author the power to negotiate for the realized value of the work. That is how the separate renewal term was intended to operate. See Ringer, Renewal of Copyright (1960), reprinted as Copyright Law Revision Study No. 31, prepared for the Senate Committee on the Judiciary, 86th Cong., 2d. Sess., 125 (1961) ("Congress wanted to give [the author] an opportunity to benefit from the success of his work and to renegotiate disadvantageous bargains . . . made at a time when the value of the work [wa]s unknown or conjectural and the author . . . necessarily in a poor bargaining position"). At heart, petitioners' true complaint is that they will have to pay more for the use of works they have employed in creating their own works. But such a result was contemplated by Congress and is consistent with the goals of the Copyright Act.

With the Copyright Act of 1790, Congress provided an initial term of protection plus a renewal term that did not survive the author. In the Copyright Act of 1831, Congress devised a completely separate renewal term that survived the death of the author so as to create a "new estate" and to benefit the author's family, and, with the passage of the 1909 Act, his executors. See *supra*, at 217–219. The 1976 Copyright Act provides a single, fixed term, but provides an inalienable termination right. See 17 U. S. C. §§ 203, 302. This evolution of the duration of copyright protection tellingly illustrates the difficulties Congress faces in attempting to "secur[e] for limited Times to Authors . . . the exclusive Right to their respective Writings." U. S. Const., Art. I, § 8, cl. 8. Absent an explicit statement of congressional intent that the rights in the renewal term of an owner of a pre-existing work are extinguished upon incorporation of his work into another work, it is not our role to alter the delicate balance Congress has labored to achieve.

## C

In a creative, though ultimately indefensible, exposition of the 1909 Act, the dissent attempts to breathe life into petitioners' suggestion that the derivative work is somehow independent of the pre-existing work. Although no Court of Appeals in the 81 years since enactment of the 1909 Act has held as much, and although the petitioners have not argued the point, the dissent contends that "§ 7 was intended to . . . give the original author the power to sell the right to make a derivative work that upon creation and copyright would be completely independent of the original work." *Post*, at 244; see also *post*, at 248. This assertion, far removed from the more modest holding of *Rohauer*, is derived from three erroneous premises.

First, we think the dissent misreads § 7, which provides:

"Compilations or abridgments, adaptations, arrangements, dramatizations, translations, or other versions of

works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works."   17 U. S. C. § 7 (1976 ed.).

The provision consists of one sentence with two clauses divided by a semicolon.   The first clause lists the types of works that may be derivative works, explains that one may incorporate either copyrighted or public domain works into a derivative work, and further explains that the derivative work itself is copyrightable.   The clause also expressly limits incorporation of copyrighted works to instances where the owner of the pre-existing work "consents."

The second clause explains what publication of the new work does *not* portend: Publication of the derivative work does not *"affect the force or validity of any subsisting copyright upon the matter employed"* (emphasis added); publication of the derivative work does not mean that use of the original work in other works is precluded; and publication does not mean that a copyright in the original work shall be secured, *e. g.*, if the work was in the public domain, or extended, as where the original work was copyrighted before the date that the derivative work is copyrighted.   The plain meaning of the italicized sentence is that the copyright in the "matter employed"—the pre-existing work when it is incorporated into the derivative work—is not abrogated by publication of the new work.   The succeeding phrases preserve the copyright status of the original work: Publication does not operate to prohibit other uses of the original work or to

"secure or extend copyright in such original works." Cf. *post*, at 249.

The dissent fails to heed § 7's preservation of copyright in both the "matter employed" and the "original work." Under its theory, only the latter is preserved. See *post*, at 253 ("author's right to sell his derivative rights is exercised when consent is conveyed and completed when the derivative work is copyrighted"); *post*, at 250 (underlying work "owner . . . retains full dominion and control over all other means of exploiting" underlying work). In light of § 7's explicit preservation of the "force and validity" of the copyright in the "matter employed," the dissent is clearly wrong when it asserts that § 7 was intended to create a work that is "completely independent" of the pre-existing work. *Post*, at 245. The dissent further errs when it unjustifiably presumes that § 7 "limit[s] the enforceability of the derivative copyright." *Post*, at 249.

According to the dissent, § 7 requires the derivative work author to obtain "consent of the proprietor of the copyright" in the pre-existing work, because "§ 7 . . . derogate[s] in some manner from the underlying author's copyright rights." *Post*, at 241. The more natural inference to be drawn from the requirement of consent is that Congress simply intended that a derivative work author may not employ a copyrighted work without the author's permission, although of course he can obtain copyright protection for his own original additions.

The text of § 7 reveals that it is not "surplusage." *Post*, at 244. It does not merely stand for the proposition that authors receive copyright protection for their original additions. It also limits the effect of the publication of the derivative work on the underlying work. See *supra*, at 231 and this page. Nowhere else in the Act does Congress address the treatment to be afforded derivative works. The principle that additions and improvements to existing works of art receive copyright protection was settled at the time the 1909 Act was enacted, a principle that Congress simply codified in § 7.

Second, the dissent attempts to undercut the plain meaning of § 7 by looking to its legislative history and the substitution of the term "publication" for "copyright" in the force or validity clause. According to the dissent, that particular alteration in the proposed bill "made clear that it was the publication of the derivative work, not the copyright itself, that was not to 'affect the force or validity of any subsisting copyright.'" *Post*, at 249. Under the 1909 Act, it was necessary to publish the work with proper notice to obtain copyright. Publication of a work without proper notice automatically sent a work into the public domain. See generally 2 Nimmer § 7.02[C][1]; 17 U. S. C. § 10 (1976 ed.). The language change was suggested only to ensure that the publication of a "new compiled work" without proper notice, including smaller portions that had not been previously published and separately copyrighted, would not result in those sections moving into the public domain. See Note, 44 Brooklyn L. Rev., at 919–920. Had the bill retained the term "copyright," publication alone could have affected the force or validity of the copyright in the pre-existing work. Thus, far from telling us anything about the copyright in the derivative work, as the dissent apparently believes it does, the language change merely reflects the practical operation of the Act.

Third, we think the dissent errs in its reading of § 3. Section 3 provides:

"The copyright provided by this title shall protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright." 17 U. S. C. § 3 (1976 ed.).

The dissent reasons that § 7, "read together with § 3, plainly indicates that the copyright on a derivative work extends to both the new material and that 'in which copyright is already subsisting.' The author or proprietor of the derivative work therefore has the statutory right to publish and distribute the entire work." *Post*, at 241. Section 3, however,

undermines, rather than supports, the dissent's ultimate conclusion that the derivative work is "completely independent" of the pre-existing work. *Post*, at 245. Section 3 makes three distinct points: (1) copyright protects the copyrightable parts of the work; (2) copyright extends to parts of the work in which copyright was already obtained, and (3) the duration or scope of the copyright already obtained will not be extended. Important for this case is that § 3 provides that one can obtain copyright in a work where parts of the work are already copyrighted. For example, one could obtain a copyright in an opera even though three of the songs to be used were already copyrighted. This, and only this, is what is meant in § 7 when it states that "[c]ompilations or abridgments, adaptations, arrangements, dramatizations, translations or other versions of works . . . or works republished with new matter shall be regarded as *new works* subject to copyright under the provisions of this title."

More important, however, is that under the express language of § 3, one obtains a copyright on the entire work, but the parts previously copyrighted get copyright protection only according to the "duration or scope" of the already existing copyright. Thus, if an author attempts to obtain copyright in a book derived from a short story, he can obtain copyright on the book for the full copyright term, but will receive protection of the story parts only for the duration and scope of the rights previously obtained. Correlatively, if an author attempts to copyright a novel, *e. g.*, about Cinderella, and the story elements are already in the public domain, the author holds a copyright in the novel, but may receive protection only for his original additions to the Cinderella story. See *McCaleb* v. *Fox Film Corp.*, 299 F. 48 (CA5 1924); *American Code Co.* v. *Bensinger*, 282 F. 829 (CA2 1922).

The plain language of the first clause of § 7 ensures that this scheme is carried out with respect to "[c]ompilations or abridgments, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain

or of copyrighted works . . . or works republished with new matter," *i. e.*, derivative works. The second clause of § 7 clarifies what might have been otherwise unclear—that the principle in § 3 of preservation of the duration or scope of the subsisting copyright applies to derivative works, and that neither the scope of the copyright in the matter employed nor the duration of the copyright in the original work is undermined by publication of the derivative work. See *Adventures in Good Eating* v. *Best Places to Eat*, 131 F. 2d 809, 813, n. 3 (CA7 1942); *G. Ricordi & Co.* v. *Paramount Pictures, Inc.*, 189 F. 2d 469 (CA2), cert. denied, 342 U. S. 849 (1951); *Russell* v. *Price*, 612 F. 2d, at 1128; see also 1 Nimmer § 3.07.

If one reads the plain language of § 7 and § 3 together, one must conclude that they were enacted in no small part to ensure that the copyright in the pre-existing work would not be abrogated by the derivative work. Section 7 requires consent by the author of the pre-existing work before the derivative work may be produced, and both provisions explicitly require that the copyright in the "subsisting work" will not be abrogated by incorporation of the work into another work.

If the dissent's theory were correct, § 3 need only say that "copyright provided by this title shall protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting." Instead, § 3 goes on to say that the latter coverage exists "without extending the duration or scope of such copyright." Clearly, the 1909 Act's plain language requires that the underlying work's copyright term exists *independently* of the derivative work's term, even when incorporated and even though the derivative work holder owns copyright in the whole "work." If the terms must exist separately, each copyright term must be examined for the validity and scope of its grant of rights.

In this case, the grant of rights in the pre-existing work lapsed and, therefore, the derivative work owners' rights to

use those portions of the pre-existing work incorporated into the derivative work expired. Thus, continued use would be infringing; whether the derivative work may continue to be published is a matter of remedy, an issue which is not before us. To say otherwise is to say that the derivative work nullifies the "force" of the copyright in the "matter employed." Whether or not we believe that this is good policy, this is the system Congress has provided, as evidenced by the language of the 1909 Act and the cases decided under the 1909 Act. Although the dissent's theory may have been a plausible option for a legislature to have chosen, Congress did not so provide.

## III

Petitioners assert that even if their use of "It Had to Be Murder" is unauthorized, it is a fair use and, therefore, not infringing. At common law, "the property of the author . . . in his intellectual creation [was] absolute until he voluntarily part[ed] with the same." *American Tobacco Co.* v. *Werckmeister*, 207 U. S. 284, 299 (1907). The fair use doctrine, which is incorporated into the 1976 Act, evolved in response to this absolute rule. See *Harper & Row*, 471 U. S., at 549–551. The doctrine is an "'equitable rule of reason,'" *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S., at 448, which "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Iowa State University Research Foundation, Inc.* v. *American Broadcasting Cos.*, 621 F. 2d 57, 60 (CA2 1980). Petitioners contend that the fair use doctrine should be employed in this case to "avoid [a] rigid applicatio[n] of the Copyright Act." Brief for Petitioners 42.

In 17 U. S. C. § 107, Congress provided examples of fair use, *e. g.*, copying "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research," and listed four

nonexclusive factors that a court must consider in determining whether an unauthorized use is not infringing:

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

"(2) the nature of the copyrighted work;

"(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

"(4) the effect of the use upon the potential market for or value of the copyrighted work."

The Court of Appeals determined that the use of Woolrich's story in petitioners' motion picture was not fair use. We agree. The motion picture neither falls into any of the categories enumerated in § 107 nor meets the four criteria set forth in § 107. "[E]very [unauthorized] commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Sony Corp. of America* v. *Universal Studios, Inc., supra,* at 451. Petitioners received $12 million from the re-release of the motion picture during the renewal term. 863 F. 2d, at 1468. Petitioners asserted before the Court of Appeals that their use was educational rather than commercial. The Court of Appeals found nothing in the record to support this assertion, nor do we.

Applying the second factor, the Court of Appeals pointed out that "[a] use is less likely to be deemed fair when the copyrighted work is a creative product." 863 F. 2d, at 1481 (citing *Brewer* v. *Hustler Magazine, Inc.,* 749 F. 2d 527, 529 (CA9 1984)). In general, fair use is more likely to be found in factual works than in fictional works. See 3 Nimmer § 13.05[A], pp. 13–77 to 13–78 ("[A]pplication of the fair use defense [is] greater . . . in the case of factual works than in the case of works of fiction or fantasy"); cf. *Harper & Row,* 471 U. S., at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fan-

tasy"). A motion picture based on a fictional short story obviously falls into the latter category.

Examining the third factor, the Court of Appeals determined that the story was a substantial portion of the motion picture. See 471 U. S., at 564–565 (finding unfair use where quotation from book "'took what was essentially the heart of the book'"). The motion picture expressly uses the story's unique setting, characters, plot, and sequence of events. Petitioners argue that the story constituted only 20% of the motion picture's story line, Brief for Petitioners 40, n. 69, but that does not mean that a substantial portion of the story was not used in the motion picture. "[A] taking may not be excused merely because it is insubstantial with respect to the *infringing* work." *Harper & Row, supra,* at 565.

The fourth factor is the "most important, and indeed, central fair use factor." 3 Nimmer § 13.05[A], p. 13–81. The record supports the Court of Appeals' conclusion that rerelease of the film impinged on the ability to market new versions of the story. Common sense would yield the same conclusion. Thus, all four factors point to unfair use. "This case presents a classic example of an unfair use: a commercial use of a fictional story that adversely affects the story owner's adaptation rights." 863 F. 2d, at 1482.

For the foregoing reasons, the judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, concurring in the judgment.

Although I am not convinced, as the Court seems to be, that the decision in *Miller Music Corp.* v. *Charles N. Daniels, Inc.,* 362 U. S. 373 (1960), was required by the Copyright Act, neither am I convinced that it was an impermissible construction of the statute. And because *Miller Music,* in my view, requires the result reached by the Court in this case, I concur in the judgment of affirmance.

JUSTICE STEVENS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

The Constitution authorizes the Congress:

"To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . ." U. S. Const. Art. I, § 8, Cl. 8.

Section 6 of the Copyright Act of 1909, 35 Stat. 1077, 17 U. S. C. § 7 (1976 ed.) (hereafter § 7), furthers that purpose; § 23 of that Act, 17 U. S. C. § 24 (1976 ed.) (hereafter § 24), as construed by the Court in this case, does not. It is therefore appropriate to begin with § 7.[1]

I

In a copyright case, as in any other case, the language of the statute provides the starting point. *Community for Creative Non-Violence* v. *Reid*, 490 U. S. 730, 739 (1989); *Mills Music, Inc.* v. *Snyder*, 469 U. S. 153, 164 (1985).

Section 7 provides in pertinent part:

"Compilations or abridgments, adaptations, arrangements, dramatizations, translations, or other versions of

---

[1] Although the Court of Appeals determined the rights of the parties by looking to the 1909 Act, respondent now argues that the 1976 Act is applicable. At the time petitioners secured their copyright in the film in 1954, and respondent renewed his copyright in the short story in 1969, the Copyright Act of 1909 was in effect. There is no evidence that Congress in the Copyright Act of 1976 intended to abrogate rights created under the previous Act. I therefore take it as evident that while the cause of action under which respondent sues may have been created by the 1976 Act, the respective property rights of the parties are determined by the statutory grant under the 1909 Act. See *Roth* v. *Pritikin*, 710 F. 2d 934, 938 (CA2), cert. denied, 464 U. S. 961 (1983); *International Film Exchange, Ltd.* v. *Corinth Films, Inc.*, 621 F. Supp. 631 (SDNY 1985); Jaszi, When Works Collide: Derivative Motion Pictures, Underlying Rights, and the Public Interest, 28 UCLA L. Rev. 715, 746–747 (1981) (hereinafter Jaszi). Cf. 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 1.11, p. 1–96 (1989) (hereinafter Nimmer) (no explicit statement of a legislative intent to apply the current Act retroactively).

works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works . . . shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works."

This statutory provision deals with derivative works — works that include both old material and new material. The plain language of § 7 confers on the entire derivative work — not just the new material contained therein — the status of all other works of authorship, that of "new works subject to copyright under the provisions of this title." Among those rights is that specified in § 3 of the 1909 Act, 17 U. S. C. § 3 (1976 ed.), which applies both to composite and derivative works and states that "the copyright provided by this Act shall protect all the copyrightable component parts of the work copyrighted, and all matter therein in which copyright is already subsisting, but without extending the duration or scope of such copyright." In turn, under § 1, 17 U. S. C. § 1 (1976 ed.), the author or proprietor of the copyright has the right to distribute and publicly perform the copyrighted derivative work. §§ 1(a), 1(d).[2] The statute does not say

---

[2] Section 1 of the 1909 Act, 35 Stat. 1075, provides in pertinent part:

"That any person entitled thereto, upon complying with the provisions of this Act, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work;

. . . . .

"(d) To perform or represent the copyrighted work publicly if it be a drama . . . ; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever."

In its response to this dissent, the Court completely ignores the plain language of § 1.

anything about the duration of the copyright being limited to the underlying work's original term; rather, derivative works made with the consent of the author and derivative works based on matter in the public domain are treated identically. They are both given independent copyright protection. Section 7, read together with § 3, plainly indicates that the copyright on a derivative work extends to both the new material and that "in which copyright is already subsisting." § 3. The author or proprietor of the derivative work therefore has the statutory right to publish and distribute the entire work.[3]

The structure of § 7 confirms this reading. The statute does not merely provide the derivative author with a right to copyright but goes on to set limitations and conditions on that copyright. The statute makes "the consent of the proprietor of the [underlying] copyright" a precondition for copyright of the derivative work, a provision that would make little sense if the copyright provided by § 7 did not derogate in some manner from the underlying author's copyright rights.[4] The

---

[3] The Court states that this reading of § 7 is "creative," has not been adopted by any Court of Appeals in the history of the 1909 Act, and has not been argued by petitioners. *Ante*, at 230. Although I am flattered by this comment, I must acknowledge that the credit belongs elsewhere. In their briefs to this Court, petitioners and their *amici* argue that § 7 created an independent but limited copyright in the entire derivative work entitled to equal treatment with original works under the renewal and duration provisions of § 24. Brief for Petitioners 14–15, 17, 21, 29–30; Brief for Columbia Pictures Industries, Inc., et al., as *Amici Curiae* 11, 13, 15. That was also the central argument of Judge Friendly in his opinion for the Court of Appeals for the Second Circuit, see *Rohauer* v. *Killiam Shows, Inc.*, 551 F. 2d 484, 487–488, 489–490, 493–494, cert. denied, 431 U. S. 949 (1977), and Judge Thompson dissenting from the panel decision below, see *Abend* v. *MCA, Inc.*, 863 F. 2d 1465, 1484–1487 (CA9 1988). Indeed, Judge Friendly only addressed the equities with great reservation, 551 F. 2d, at 493, after "a close reading of the language of what is now § 7." *Id.*, at 489.

[4] The drafters of the 1909 Act were well aware of the difficulty of contacting distant authors who no longer wished to enforce their copyright

statute also directs that the right granted the derivative work proprietor should not "be construed to imply an exclusive right to such use of the original works," suggesting, by negative implication, that it should be read to include a nonexclusive right to use of the original works. The provision that *publication* "shall not affect the force or validity of any subsisting copyright" also suggests that publication would otherwise have the capacity to affect the force or validity of the original copyright: By publishing the derivative work

---

rights. In § 24, for example, Congress provided that a proprietor could secure and renew copyright on a composite work when the individual contributions were not separately registered. The provision was apparently addressed to the difficulties such proprietors had previously faced in locating and obtaining the consent of authors at the time of renewal. See H. R. Rep. No. 2222, 60th Cong., 2d Sess., 15 (1909); 1 Legislative History of the 1909 Copyright Act, Part C, p. 56 (E. Brylawski & A. Goldman eds. 1976) (statement of Mr. Elder) (hereinafter Brylawski & Goldman); 5 *id.*, Part K, pp. 18–19 (statement of Mr. Putnam); 5 *id.*, Part K, p. 77 (statement of Mr. Hale). See also Elder, Duration of Copyright, 14 Yale L. J. 417, 418 (1905). The effect of the § 7 consent requirement under the Court's reading should not only be to forbid the author of the derivative work to "employ a copyrighted work without the author's permission," *ante*, at 232, but also to penalize him by depriving him both of the right to use his own new material and, in theory, of the right to protect that new material against use by the public. It is most unlikely that a Congress which intended to promote the creation of literary works would have conditioned the protection of new material in an otherwise original work on "consent" of an original author who did not express the desire to protect his own work.

The Court of Appeals thought that the failure of Congress to grant an "exemption" to derivative works similar to that it granted composite works demonstrated its intention that derivative works lapse upon termination of the underlying author's copyright interest. 863 F. 2d, at 1476. Section 24, however, does not exempt composite works from the renewal provision, but merely provides for their renewal by the proprietor alone when the individual contributions are not separately copyrighted. See 2 Nimmer § 9.03[B], p. 9–36. Moreover, the "author," entitled to renewal under § 24, refers back to the author of the original work and the derivative work. Congress did not need to make special provision for the derivative work in § 24 because it already did so in § 7, making it a new work "subject to copyright under the provisions of this title." 17 U. S. C. § 7 (1976 ed.).

without satisfying the notice requirements of the Act, the derivative author would dedicate to the public not only his own original contribution, but also that of the original author. Conversely, the limitation that publication does not "secure or extend copyright in such original works" would be unnecessary if the copyrighted derivative work did not include within it some of the material covered by the earlier copyright, or if the term of the derivative copyright did not extend beyond the life of the original copyright.[5] Although the derivative copyright *protects* only the new material contained within the new work, that limitation is not the product of the limited extent of the copyright—which encompasses both new and old material—but rather of the specific statutory language restricting its effect against third parties.[6]

---

[5] It is instructive to compare the language of § 7 to that used by Congress in 1976 to indicate that copyright in a derivative work under the new Act attached only to the new material:

"The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material." 17 U. S. C. § 103(b) (1988 ed.).

[6] I thus agree with the Court that publication of a derivative work cannot extend the scope or duration of the copyright in the original work, *ante,* at 234–235, and that the underlying work's copyright term exists independently of the derivative work's term. *Ante,* at 231–232, 235. As much is clear from the language of § 7, which extends the copyright to the entire work, but then limits the effect of that copyright. I further agree that the original author's right to "consent" to the copyright of a derivative work terminates when the statutory term of the copyright in the underlying work expires. *Ante,* at 235. As I explain, *infra* at 251–253, that result follows from the language of § 24. I do not agree, however, that the statutory right to distribute and publicly perform a derivative work that has been copyrighted with the original author's consent during the original term of the underlying work is limited by the validity and scope of the original copyright. *Ante,* at 235. Section 7, in conjunction with § 24, gives the derivative author two full terms of copyright in the entire derivative

Any other interpretation would render the provision largely surplusage. The Copyright Act of 1909 elsewhere accords protection to "all the writings of an author," § 4, including dramatic composition, § 5, and long before the Act of 1909, it was recognized that the additions and improvements to existing works of art were subject to copyright as original works of authorship.[7] Congress would hardly have needed to provide for the copyright of derivative works, including the detailed provisions on the limit of that copyright, if it intended only to accord protection to the improvements to an original work of authorship. In my opinion, § 7 was intended to do something more: to give the original author the power

work both when the original work is used with the consent of the original author and when the original work is in the public domain. My conclusion thus rests upon the language of the statute. The Court's contrary assertion, that if the right to publish the derivative work extended beyond the original term of the underlying work it would "nulli[fy] the 'force' of the copyright in the 'matter employed,'" *ante*, at 236, simply begs the question of the extent of the original author's statutory rights. Even after the derivative work has been copyrighted, the original author retains all of his statutory rights, including the right to consent to the creation of additional derivative works during both the original and renewal terms. Moreover, even if the derivative work did derogate from the force of the original work, the provision to which the Court apparently refers states only that *"publication"* of a derivative work—and not consent to its creation—shall not affect the force of the copyright in the matter employed. The Court can avoid making § 7 complete surplus (and allow it to limit the rights of both the original and the derivative author) only by distorting the plain language of that provision.

[7] See, *e. g., Gray* v. *Russell*, 10 F. Cas. 1035, 1037–1038 (No. 5,728) (CC Mass. 1839); *Emerson* v. *Davies*, 8 F. Cas. 615, 618–619 (No. 4,436) (CC Mass. 1845); *Shook* v. *Rankin*, 21 F. Cas. 1335, 1336 (No. 12,804) (CC N. D. Ill. 1875). The Court's difficulty in explaining away the language of § 7 is not surprising. The authority upon whom it almost exclusively relies, see *ante*, at 223, had the same difficulty, stating at one point that "[t]he statutory text was somewhat ambiguous," 1 Nimmer, p. 3–22.2, and admitting at another that under his reading of the Copyright Act the provision was largely irrelevant. See *id.*, at 3–29, n. 17 ("[I]t is consent referred to in Sec. 7, but which would have efficacy as a matter of contract law even without Sec. 7"). At least in the Copyright Act of 1909, however, Congress knew exactly what it was doing.

to sell the right to make a derivative work that upon creation and copyright would be completely independent of the original work.

## II

The statutory background supports the conclusion that Congress intended the original author to be able to sell the right to make a derivative work that could be distributed for the full term of the derivative work's copyright protection. At the time of the enactment of § 7, copyright in the right to dramatize a nondramatic work was a relatively recent innovation with equivocal support. Until 1870, an author had only the right to prevent the copying or vending of his work in the identical medium.[8] The Act of 1870, which gave the author the "sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and vending," made a limited start toward further protection, providing that "authors may reserve the right to dramatize or to translate their own works." Ch. 230, § 86, 16 Stat. 212. The identical language was carried over when the statute was revised in 1873. Rev. Stat. § 4952. The Act of 1891 was a landmark. It gave the same rights to the "author" as had the previous statutes, but provided further that "authors or their assigns shall have exclusive right to dramatize and translate any of their works for which copyright shall have been obtained under the laws of the United States." Ch. 565, § 4952, 26 Stat. 1107. The case law was in accord. Although courts were occasionally willing to enjoin abridgments as infringing, in 1853 Justice Grier wrote that a dramatization of the novel "Uncle Tom's Cabin" would not infringe

---

[8] The Act of 1790, passed by the First Congress, provided "the sole right and liberty of printing, reprinting, publishing and vending" the copyrighted work. § 1, 1 Stat. 124. Its successor, the Act of 1831, repeated the language that the author of a copyrighted work "shall have the sole right and liberty of printing, reprinting, publishing, and vending" the work. Ch. 16, § 1, 4 Stat. 436. Benjamin Kaplan has written that the Act of 1870 constituted an "enlargement of the monopoly to cover the conversion of a work from one to another artistic medium." An Unhurried View of Copyright 32 (1967) (hereinafter Kaplan).

the author's rights in the book, see *Stowe* v. *Thomas*, 23 F. Cas. 201, 208 (No. 13,514) (CC ED Pa. 1853),[9] and it was not until after the passage of the 1909 Act that this Court first held that a copy of a literary work in another form than the original could infringe the author's copyright. See *Kalem Co.* v. *Harper Brothers*, 222 U. S. 55 (1911).[10]

---

[9] "By the publication of Mrs. Stowe's book, the creations of the genius and imagination of the author have become as much public property as those of Homer or Cervantes. . . . All her conceptions and inventions may be used and abused by imitators, play-rights and poetasters [They are no longer her own—those who have purchased her book, may clothe them in English doggerel, in German or Chinese prose. Her absolute dominion and property in the creations of her genius and imagination have been voluntarily relinquished.] All that now remains is the copyright of her book; the exclusive right to print, reprint and vend it, and those only can be called infringers of her rights, or pirates of her property, who are guilty of printing, publishing, importing or vending without her license, 'copies of her book.'" *Stowe* v. *Thomas*, 23 F. Cas., at 208 (footnote omitted).

It appears that at least as late as 1902, English copyright law also did not recognize that a dramatization could infringe an author's rights in a book. See E. MacGillivray, A Treatise Upon The Law of Copyright 114 (1902); see also *Reade* v. *Conquist*, 9 C. B. N. S. 755, 142 Eng. Rep. 297 (C. P. 1861); *Coleman* v. *Wathen*, 5 T. R. 245, 101 Eng. Rep. 137 (K. B. 1793). Even after the passage of the Act of 1870, one American commentator flatly declared: "Even if the public recitation of a book, in which copyright exists, is not made from memory, but takes the form of a public reading, from the work itself, of the whole or portions of it, this would not amount to an infringement of the author's copyright." 2 J. Morgan, Law of Literature 700–701 (1875).

[10] "The American cases reflect no recognition that unauthorized dramatization could infringe rights in a nondramatic work until the 1870 copyright revision provided authors with the same option to reserve dramatization rights that they were afforded with respect to translation. By then, dramatizations—like other derivative works—already had enjoyed almost a century of substantial independence. During this period, courts construing federal copyright statutes were willing to extend protection to them, but were reluctant to interfere with their unauthorized production." Jaszi 783.

See also Goldstein, Derivative Rights and Derivative Works in Copyright, 30 J. Copyright Society 209, 211–215 (1983).

The drafts of the copyright bill, considered by the Conferences held by the Register of Copyrights and the Librarian of Congress in 1905 and 1906,[11] had three distinctive features with respect to derivative works: They provided a limited period of protection from the creation of derivative works during which a derivative work could only be created with "the consent of the author or his assigns," 2 Brylawski & Goldman, Part D, p. LXV;[12] they distinguished between the copyright term for original works of authorship and for derivative works, according the latter a shorter period of protection;[13] and, finally, they provided that derivative works produced with the consent of the original author would be considered new works entitled to copyright. Together these provisions reveal a more complicated set of theoretical premises than is commonly acknowledged. Although originality of authorship was an essential precondition of copy-

---

[11] The history of the Copyright Act of 1909 is recounted in Justice Frankfurter's opinion for the Court in *Fred Fisher Music Co.* v. *M. Witmark & Sons*, 318 U. S. 643, 652 (1943).

[12] The first draft of the copyright bill considered in 1905 provided that if the author or his assigns did not make or authorize to be made a dramatization within 10 years of the date of registration, the work could be used for dramatization by other authors. 2 Brylawski & Goldman, Part D, p. LXV. A similar provision appeared in the third draft of the bill considered by the Conference the following year, 3 *id.*, Part E, p. XL, and in the bill submitted by the Register of Copyrights to Congress. 1 *id.*, Part B, pp. 37–38. The provision was eventually dropped during hearings in Congress and was never adopted into law.

[13] The first draft provided identical terms for both original works of authorship and derivative works, 2 *id.*, Part D, pp. XXXVII–XXXVIII. Successive drafts gave the copyright in the original work to the author for his life plus 50 years, but limited the copyright in a derivative work to 50 years. 3 *id.*, Part E, pp. LIII–LIV; 1 *id.*, Part B, pp. 34–35. The single term was rejected at a late date by Congress and the final Act eventually provided the same two-term copyright for original and derivative works. See generally B. Ringer, Renewal of Copyright (1960), reprinted as Copyright Law Revision Study No. 31, prepared for the Senate Committee on the Judiciary, 86th Cong., 2d Sess., 115–121 (1961).

right, the duration of the copyright term and the extent of copyright protection rested upon the nature of the work as a whole rather than the original expression contributed by the copyright author. Moreover, the consent of the underlying author to the production of a derivative work was to be encouraged and, once given, entitled the derivative work to independence from the work upon which it was based.

The first two provisions were not included in the Copyright Act, which gave authors the right, during the full term of copyright, to create or consent to the creation of derivative works which would then enjoy their own copyright protection. But the third provision which set the conditions upon which an original author would consent and the second author would create a derivative work entitled to protection under the Copyright Act carried forward the view that the derivative copyright extended beyond the original contribution of the derivative author. Throughout the debates on the provision, the drafters of the Copyright Act evinced their understanding that the derivative copyright itself encompassed the whole derivative work. The first draft of § 7, considered by the second Conference in 1905, would have provided copyright as a new work for a derivative work "produced with the consent and authorization of the author of the original," without any restrictions on the effect of that copyright on the copyright in the original work. 2 Brylawski & Goldman, Part D, p. XXXII. By the time of the third Conference in 1906, the Register of Copyrights expressed his concern that that provision would be read too broadly, adding the proviso: "That the copyright thus secured shall not be construed to grant any exclusive right to such use of the original works, except as that may be obtained by agreement with the author or proprietor thereof." 3 *id.*, Part E, p. LI. The implication was that, in the absence of an agreement, the author of the derivative work would have, as a matter of copyright law, a nonexclusive right "to such use of the original works."

The final draft presented to Congress at the end of 1906 addressed a parallel problem that the license to use the underlying material might also detract from the rights of the underlying copyright if the derivative author did not adequately protect the material on which the copyright was subsisting. To allay this concern, the Register added the language "no such copyright shall affect the force or validity of any subsisting copyright upon the matter employed or any part thereof." 1 *id.*, Part B, p. 15.

Two significant changes were made during the congressional hearings from 1907 through 1909, but with those exceptions the provision survived intact. First, in response to the objection that the language of § 6, codified at 17 U. S. C. § 7 (1976 ed.), in conjunction with that of § 3, codified at 17 U. S. C. § 3 (1976 ed.), would be read to give the derivative work proprietor "a new term of copyright running on this old matter of his" and, in that way, provide for perpetual copyright, 4 Brylawski & Goldman, Part J, pp. 132–138 (statement of Mr. Porterfeld); see also *id.*, at 428, Congress limited the enforceability of the derivative copyright, adding language that publication of the dramatization would not "secure or extend copyright in such original works." § 6, 35 Stat. 1077. Second, in response to the objection that the Register's draft provision did not address with sufficient precision the possibility that failure of the derivative copyright would allow the underlying work to enter the public domain, Congress substituted the word "publication" for "copyright" in the "force or validity" clause. Congress thus made clear that it was the publication of the derivative work, not the copyright itself, that was not to "affect the force or validity of any subsisting copyright." *Ibid.*[14]

---

[14] The amendment apparently emerged from dialogue between Mr. W. B. Hale, representative of the American Law Book Company, and Senator Smoot:

The legislative history confirms that the copyright in derivative works not only gives the second creative product the monopoly privileges of excluding others from the unconsented use of the new work, but also allows the creator to publish his or her own work product.  The authority to produce the derivative work, which includes creative contributions by both the original author and the second artist, is dependent upon the consent of the proprietor of the underlying copyright.  But once that consent has been obtained, and a derivative work has been created and copyrighted in accord with that consent, "a right of property spr[ings] into existence," *Edmonds* v. *Stern*, 248 F. 897, 898 (CA2 1918), that Congress intended to protect.  Publication of the derivative work does not "affect the force or validity" of the underlying copyright except to the extent that it gives effect to the consent of the original proprietor.  That owner—and in this case, the owner of a renewal of the original copyright—retains full dominion and control over all other means of exploiting that work of art, including the right to authorize other derivative works.  The original copyright may have relatively little value because the creative contribution of the second artist is far more significant than the original con-

---

"Mr. Hale: 'There is another verbal criticism I should like to make in section 6 of the Kittredge bill, which also relates to compilations, abridgments, etc.'

"The Chairman [Senator Smoot].  'I think it is the same in the other bills.'

"Mr. Hale.  'Yes; it is the same in all the bills.  I heartily agree with and am in favor of that section; but in line 12, in lieu of the words "but no such copyright shall effect the force or validity," etc., I would prefer to substitute these words: "and the publication of any such new work shall not affect the copyright," etc. . . .  Under the act, as it stands now, it says the copyright shall not affect it.  I would like to meet the case of a new compiled work, within the meaning of this clause, that is not copyrighted, or where, by reason of some accident the copyright fails.  That should not affect the original copyrights in the works that have entered into and formed a part of this new compiled work.  It does not change the intent of this section in any way.'"  5 Brylawski & Goldman, Part K, p. 78.

tribution, but that just means that the rewards for creativity are being fairly allocated between the two artists whose combined efforts produced the derivative work.

### III

Nothing in § 24 requires a different result. The portion of that section dealing with copyright renewals provides:

> "[T]he author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, . . . shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright." 17 U. S. C. § 24 (1976 ed.).

That statute limits the renewal rights in a copyright to the specified statutory beneficiaries, "completely dissevering the title, breaking up the continuance . . . and vesting an absolutely new title eo nomine in the persons designated." *White-Smith Music Publishing Co.* v. *Goff*, 187 F. 247, 250 (CA1 1911). Since copyright is a creature of statute and since the statute gives the author only a contingent estate, with "the widow, widower, or children" as remaindermen, the author "ha[s] only an expectancy to assign" for the second term. *Miller Music Corp.* v. *Charles N. Daniels, Inc.*, 362 U. S. 373, 375 (1960). The original author may not sell more than he owns. He may not convey the second-term rights to print or copy the underlying work or to create additional derivative works from it. See *Gilliam* v. *American Broadcasting Cos.*, 538 F. 2d 14, 21 (CA2 1976); *G. Ricordi & Co.* v. *Paramount Pictures Inc.*, 189 F. 2d 469 (CA2), cert. denied, 342 U. S. 849 (1951).[15] Nor may the derivative author dedi-

---

[15] In *Ricordi*, the author of the derivative work not only produced a new derivative work, but also breached his covenant not to distribute the work, after the first term of the underlying copyright. As JUSTICE WHITE has

cate the underlying art to the public by failing to renew his copyright. See *Filmvideo Releasing Corp.* v. *Hastings*, 668 F. 2d 91, 93 (CA2 1981); *Russell* v. *Price*, 612 F. 2d 1123, 1128 (CA9 1979).[16] Even if the alienation of second-term rights would be in the author's best interest, providing funds when he is most in need, the restriction on sale of the corpus is a necessary consequence of Congress' decision to provide two terms of copyright.

Neither § 24 nor any other provision of the Act, however, expressly or by implication, prevents the author from exercising any of his other statutory rights during the original term of the copyright. The author of the underlying work may contract to sell his work at a bargain price during the original term of the copyright. That agreement would be enforceable even if performance of the contract diminished the value of the copyright to the owner of the renewal interest. Similarly, the original author may create and copyright his *own* derivative work; the right of an assignee or legatee to receive that work by assignment or bequest should not be limited by the interests of the owners of the renewal copyright in the underlying work. Section 1 of the Act, 17 U. S. C. § 1 (1976 ed.), gives the author the right to dramatize his own work without any apparent restriction. Such use might appear, at the time or in retrospect, to be improvident and a waste of the asset. Whatever harm the proprietor of the renewal copyright might suffer, however, is a consequence of the enjoyment by the author of the rights granted him by Congress.

The result should be no different when the author exercises his right to consent to creation of a derivative work by another. By designating derivative works as "new works"

---

explained, "*Ricordi* merely held that the licensee of a copyright holder may not prepare a new derivative work based upon the copyrighted work after termination of the grant." *Mills Music, Inc.* v. *Snyder*, 469 U. S. 153, 183, n. 7 (1985) (dissenting opinion).

[16] The result follows as well from the "force and validity" clause of § 7.

that are subject to copyright and accorded the two terms applicable to original works, Congress evinced its intention that the derivative copyright not lapse upon termination of the original author's interest in the underlying copyright. The continued publication of the derivative work, after the expiration of the original term of the prior work, does not infringe any of the statutory successor's rights in the renewal copyright of the original work. The author's right to sell his derivative rights is exercised when consent is conveyed and completed when the derivative work is copyrighted. At that point, prior to the end of the first term, the right to prevent publication of the derivative work is no longer one of the bundle of rights attaching to the copyright. The further agreement to permit use of the underlying material during the renewal term does not violate § 24 because at the moment consent is given and the derivative work is created and copyrighted, a new right of property comes into existence independent of the original author's copyright estate.

As an *ex post* matter, it might appear that the original author could have negotiated a better contract for his consent to creation of a derivative work, but Congress in § 24 was not concerned with giving an author a second chance to renegotiate his consent to the production of a derivative work.[17] It provided explicitly that, once consent was given, the derivative work was entitled as a matter of copyright law to treatment as a "new wor[k]." § 7. Ironically, by restricting the

---

[17] Congress was primarily concerned with the ability of the author to exploit his *own* work of authorship:

"Your committee, after full consideration, decided that it was distinctly to the advantage of the author to preserve the renewal period. It not infrequently happens that the author sells his copyright outright to a publisher for a comparatively small sum. If the work proves to be a great success and lives beyond the term of twenty-eight years, your committee felt that it should be the exclusive right of the author to take the renewal term, and the law should be framed as is the existing law, so that he could not be deprived of that right." H. R. Rep. No. 2222, 60th Cong., 2d Sess., at 14.

author's ability to consent to creation of a derivative work with independent existence, the Court may make it practically impossible for the original author to sell his derivative rights late in the original term and to reap the financial and artistic advantage that comes with the creation of a derivative work.[18]   Unless § 24 is to overwhelm § 7, the consent of the original author must be given effect whether or not it intrudes into the renewal term of the original copyright.

A putative author may sell his work to a motion picture company who will have greater use for it, by becoming an employee and making the work "for hire."   The 1909 Act gave the employer the right to renew the copyright in such circumstances.[19]   In addition, when an author intends that his work be used as part of a joint work, the copyright law gives the joint author common authority to exploit the underlying work and renew the copyright.[20]   The Court today

---

[18] The creation of a derivative work often is in the best interests of both the original author and his statutory successors.   As one commentator has noted:

"The movie Rear Window became a selling point for anthologies containing the Woolrich story.   The musical play Cats no doubt sent many people who dimly remembered the Love Song of J. Alfred Prufrock as the chief, if not the only oeuvre of T. S. Eliot to the bookstore for Old Possum's Book of Practical Cats."   Weinreb, Fair's Fair: A Comment on the Fair Use Doctrine, 103 Harv. L. Rev. 1137, 1147 (1990).

[19] See 17 U. S. C. § 24 (1976 ed.) ("[I]n the case of . . . any work copyrighted by . . . an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years").   See also Ellingson, Copyright Exception for Derivative Works and the Scope of Utilization, 56 Ind. L. J. 1, 11 (1980–1981).

[20] See *Shapiro, Bernstein & Co.* v. *Jerry Vogel Music Co.*, 161 F. 2d 406 (CA2 1946); *Edward B. Marks Music Corp.* v. *Jerry Vogel Music Co.*, 140 F. 2d 266 (CA2 1944).   In the "12th Street Rag" case, *Shapiro, Bernstein & Co.* v. *Jerry Vogel Music Co.*, 221 F. 2d 569 (CA2 1955), the Court of Appeals held that a work of music, intended originally to stand on its own as an instrumental, could become a joint work when it was later sold to a publisher who commissioned lyrics to be written for it.   The decision, which would give the creator of the derivative work and the underlying au-

holds, however, that the independent entrepreneur, who does not go into the company's employ and who intends to make independent use of his work, does not also have the same right to sell his consent to produce a derivative work that can be distributed and publicly performed during the full term of its copyright protection. That result is perverse and cannot have been what Congress intended.[21]

The critical flaw in the Court's analysis is its implicit endorsement of the Court of Appeals reasoning that:

> "'If *Miller Music* makes assignment of the full renewal rights in the underlying copyright unenforceable when the author dies before effecting renewal of the copyright, then *a fortiori*, an assignment of part of the rights in the underlying work, the right to produce a movie version, must also be unenforceable if the author dies before effecting renewal of the underlying copyright.'" *Ante*, at 215–216.

That reasoning would be valid if the sole basis for the protection of the derivative work were the contractual assignment of copyright, but Woolrich did not just assign the rights to produce a movie version the way an author would assign the publisher rights to copy and vend his work. Rather, he expressed his consent to production of a derivative work under § 7. The possession of a copyright on a properly created derivative work gives the proprietor rights superior to those of

thor a joint interest in the derivative work, accomplishes the same result that I believe § 7 does expressly.

[21] "The effect of the *Fred Fisher* [,318 U. S. 643 (1943),] case and other authorities is that if the author is dead when the twenty-eighth year comes round, the renewal reverts, free and clear, to his widow, children, and so forth in a fixed order of precedency; but if the author is alive in that year, the original sale holds and there is no reversion. The distinction is hard to defend and may operate in a peculiarly perverse way where on the faith of a transfer from the now-deceased author, the transferee has created a 'derivative work,' say a movie based on the original novel." Kaplan 112.

a mere licensee.   As Judge Friendly concluded, this position is entirely consistent with relevant policy considerations.[22]

In my opinion, a fair analysis of the entire 1909 Act, with special attention to § 7, indicates that the statute embodied the same policy choice that continues to be reflected in the 1976 Act.   Section 101 of the Act provides:

> "A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant."   17 U. S. C. App. § 304(c)(6)(A).

I respectfully dissent.

---

[22] "To such extent as it may be permissible to consider policy considerations, the equities lie preponderantly in favor of the proprietor of the derivative copyright.   In contrast to the situation where an assignee or licensee has done nothing more than print, publicize and distribute a copyrighted story or novel, a person who with the consent of the author has created an opera or a motion picture film will often have made contributions literary, musical and economic, as great as or greater than the original author.   As pointed out in the Bricker article [Bricker, Renewal and Extension of Copyright, 29 S. Cal. L. Rev. 23, 33 (1955)], the purchaser of derivative rights has no truly effective way to protect himself against the eventuality of the author's death before the renewal period since there is no way of telling who will be the surviving widow, children or next of kin or the executor until that date arrives.   To be sure, this problem exists in equal degree with respect to assignments or licenses of underlying copyright, but in such cases there is not the countervailing consideration that large and independently copyrightable contributions will have been made by the transferee."   *Rohauer* v. *Killiam Shows, Inc.*, 551 F. 2d 484, 493 (CA2), cert. denied, 431 U. S. 949 (1977).