06-3226-cv
Penguin Group (USA), Inc. v. Steinbeck

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: January 23, 2008      Decided: August 13, 2008)

Docket Nos. 06-3226-cv, 06-3696-cv

-------------------------------------

PENGUIN GROUP (USA) INC.,

Plaintiff-Appellant,

WAVERLY SCOTT KAFFAGA, individually as Executor of the Estate of ELAINE ANDERSON STEINBECK, DAVID SCOTT FARBER, ANDERSON FARBER RUNKLE, JEBEL KAFFAGA, BAHAR KAFFAGA and JEAN ANDERSON BOONE,

Defendants-Counterclaim-Plaintiffs-Appellants,

- v. -

THOMAS STEINBECK and BLAKE SMYLE,

Plaintiffs-Counterclaim-Defendants-Appellees,

NANCY STEINBECK,

Intervenor-Plaintiff,

MCINTOSH & OTIS, INC., THE STEINBECK HERITAGE FOUNDATION, EUGENE H. WINICK, SAMUEL PINKUS and STEVEN FRUSHTICK,

Defendants-Counterclaim-Plaintiffs,

FRANCIS ANDERSON ATKINSON and DOES 1-10,

Defendants.

-------------------------------------

Before:   SACK, KATZMANN, and RAGGI, Circuit Judges.

Appeal from an order of the United States District Court for the Southern District of New York (Richard Owen, Judge)

granting summary judgment to the appellees Thomas Steinbeck and Blake Smyle on the grounds that a notice purporting to terminate, pursuant to the Copyright Act, 17 U.S.C. §§ 304(c) and (d), a 1938 agreement granting licenses for publication of certain works of the author John Steinbeck, was valid.  Because a subsequent agreement entered into in 1994 terminated and superseded the 1938 agreement, sections 304(c) and (d) are inapplicable; the notice of termination is therefore invalid, and the 1994 agreement remains in effect.

Reversed and remanded.

RICHARD DANNAY, Cowan, Liebowitz & Latman, P.C. (Thomas Kjellberg, of counsel), New York, NY, for Plaintiff-Appellant Penguin Group (USA) Inc.

SUSAN J. KOHLMANN, Pillsbury Winthrop Shaw Pittman LLP (Carolina A. Fornos, of counsel), New York, NY, for Plaintiffs-Appellants Kaffaga et al.

MARK S. LEE, Manatt Phelps & Phillips, LLP (Benjamin G. Shatz and Alon G. Markowitz, of counsel), Los Angeles, CA, for Defendants-Appellees.

SACK, Circuit Judge:

This is an appeal from an order of the United States District Court for the Southern District of New York (Richard Owen, Judge) granting summary judgment to the appellees Thomas Steinbeck and Blake Smyle based on the court's conclusion that a "notice of termination" given in 2004 that purported to terminate, pursuant to the Copyright Act, 17 U.S.C. § 304(c) and (d), the 1938 grant of copyright licenses by the author John

2

Steinbeck, was valid.  We consider on appeal whether an agreement entered into in 1994 between Steinbeck's widow and the publisher terminated and superseded the 1938 agreement, and, if so, whether the termination notice is therefore ineffective.  Because the termination right provided by section 304(d) pursuant to which the 2004 termination notice was issued applies only to pre-1978 grants of transfers or licenses of copyright, and because the 1994 agreement left intact no pre-1978 grant for the works in question, we conclude that the 2004 notice of termination is ineffective.  The 1994 agreement remains in effect.

**BACKGROUND**

<u>Grants of Licenses of Copyright</u>

On September 12, 1938, the author John Steinbeck executed an agreement with The Viking Press (the "1938 Agreement") that established the terms for the latter's publication of some of Steinbeck's best-known works, including <u>The Long Valley</u>, <u>Cup of Gold</u>, <u>The Pastures of Heaven</u>, <u>To A God Unknown</u>, <u>Tortilla Flat</u>, <u>In Dubious Battle</u>, and <u>Of Mice and Men</u>, in all of which Steinbeck held the copyright.  In 1939, the agreement was extended to apply to four later works, including <u>The Grapes of Wrath</u>, through the operation of an option clause in the agreement.  The rights granted by the 1938 Agreement were later assigned by Viking to plaintiff-appellant Penguin Group (USA) Inc. ("Penguin"), and the duties thereunder assumed by Penguin.  The 1938 Agreement provided to the publisher, who agreed to take out copyrights in the covered works in Steinbeck's

3

name, the "sole and exclusive right" to publish the works in the United States and Canada, with Steinbeck receiving royalties based on net sales. The agreement would terminate if any of the covered works were not kept in print. The agreement was "binding upon [John Steinbeck's] heirs, executors, administrators or assigns."

During his lifetime, Steinbeck renewed the copyrights in the works covered by the 1938 Agreement so that they enjoyed protection under both of the consecutive 28-year copyright terms provided for by the version of the Copyright Act in effect at the time. When Steinbeck died in 1968, he bequeathed his interest in these copyrights to his widow, Elaine Steinbeck. His sons by a previous marriage, Thomas and John IV, each received a bequest of $50,000 in a trust arrangement.

On October 24, 1994, Elaine Steinbeck and Penguin entered into a "new agreement for continued publication" (the "1994 Agreement"). It addressed the publication by Penguin of all works that were covered by the 1938 Agreement. It added several other early Steinbeck works, some of his posthumous works, and some of Elaine Steinbeck's own works. It also changed the economic terms of the 1938 Agreement, mostly to Elaine Steinbeck's benefit, by requiring Penguin to provide a far larger annual guaranteed advance, and royalties of between ten and fifteen percent of retail (rather than wholesale) sales. The 1994 Agreement further stated that "when signed by Author and

4

Publisher, [it] will cancel and supersede the previous agreements, as amended, for the [works] covered hereunder."[1]

Elaine Steinbeck died in April 2003, bequeathing her copyright interests in the Steinbeck works at issue, as well as proceeds from the 1994 Agreement, to various testamentary heirs including her children and grandchildren from a previous marriage, but she specifically excluded Thomas Steinbeck, John Steinbeck IV, and their heirs. Her statutory termination rights expired upon her death.

On June 13, 2004, John Steinbeck's surviving son Thomas, and Blake Smyle, the sole surviving child of Steinbeck's other son, the deceased John IV, (collectively the "Steinbeck Descendants") served what purported to be a notice of termination (the "Notice of Termination") on Penguin terminating the "grants" made by the 1938 Agreement to Penguin's predecessor-in-interest (Viking).

Statutory Background

The Copyright Act gives to authors and certain enumerated family members the power to terminate prior grants of transfers or licenses of copyright. This power is based on Congressional recognition that young authors frequently enter

---

[1] A separate agreement was executed on the same day by Penguin and by Elaine Steinbeck, acting on her own behalf and on behalf of Thomas Steinbeck. Thomas Steinbeck ratified this agreement on December 22, 1994, on behalf of the other Steinbeck Descendants. This agreement, which itself is not at issue on this appeal and which governed works of John Steinbeck that are not at issue on this appeal, obligated Penguin to pay higher royalties for these works to Elaine Steinbeck and the Steinbeck Descendants.

into long-term contracts with publishers when their bargaining power is weak and their prospects for success uncertain, and discover increased leverage only when they later achieve commercial success. Indeed, in an effort to balance the interests of publishers and authors, Congress enacted provisions in the Copyright Act that "attempted to give the author a second chance to control and benefit from his work" and to "secure to the author's family the opportunity to exploit the work if the author died." Stewart v. Abend, 495 U.S. 207, 218 (1990). Congress permitted a publisher the opportunity to reap the initial rewards of an early investment in young talent, but it allowed authors to revisit the terms of earlier grants of rights once the long-term success of their works became apparent. See id.

When John Steinbeck entered into the 1938 Agreement with Viking Press, the Copyright Act of 1909 was in effect. Under that version of the Act, authors were entitled to a copyright in their works for an initial twenty-eight year period beginning on the date of a work's publication. After this period expired, the author had the right to renew the copyright for a second twenty-eight year term. The purpose of providing this renewal term was to permit "the author, originally in a poor bargaining position, to renegotiate the terms of the grant once the value of the work ha[d] been tested." Stewart, 495 U.S. at 218-19; accord Marvel Characters, Inc. v. Simon, 310 F.3d 280, 283 (2d Cir. 2002) (quoting Stewart). Publishers could, and

6

often did, thwart the purpose of this statutory scheme, however, by requiring authors to assign both their initial and renewal rights to the publisher at the same time and before the long-term value of an author's work could be ascertained.  This practice received the legal imprimatur of the Supreme Court in Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643 (1943), which held that renewal rights could be assigned by an author during a work's initial copyright term and before the vesting of the renewal right.  Id. at 656-59; see also Marvel, 310 F.3d at 284.

The 1976 amendments to the Copyright Act, which took effect in 1978, abandoned this framework.  In order to revitalize the ability of authors to revisit the terms of earlier grants of rights, the amended Act replaced the two consecutive twenty-eight year terms with a single copyright term of increased duration,[2] and it created for authors or their statutory heirs, with respect to transfers or licenses of copyright effected prior to 1978, an inalienable right to terminate the grant of a transfer or

---

[2]  The consecutive-term renewal structure was retained for pre-1978 works, however, because a "great many of the present expectancies in these cases are the subject of existing contracts, and it would [have been] unfair and immensely confusing to cut off or alter these interests."  H.R. Rep. No. 94-1476, at 139 (1976), reprinted in 1976 U.S.C.A.N. 5659, 5755. For works still in their renewal term on January 1, 1978, which include the Steinbeck works governed by the 1938 Agreement, the amendments extended the expiration date of the then-governing renewal term until "seventy-five years from the date the copyright was originally secured."  17 U.S.C. § 304(b) (1997). When the Copyright Act was amended in 1998, for works still within this seventy-five year term, the length of the term was extended again to provide those works with a total of ninety-five years of copyright protection.  Pub. L. No. 105-298, 112 Stat. 2827, 2828-29 (1998).

license.  17 U.S.C. § 304(c).  The section provides, in pertinent part:

> In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, . . . the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by [the author or the author's heirs as specified at section 304(a)(1)(C)], otherwise than by will, is subject to termination under the following conditions:
>
> (1) . . . In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected . . . by the author who executed it or, if such author is dead, by the person or persons who, under clause (2) of this subsection, own and are entitled to exercise a total of more than one-half of that author's termination interest.
>
> (2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:
>
> . . .
>
> (B) The author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half of the author's interest is divided among them.[3]
>
> (3) Termination of the grant may be effected at any time during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later.

---

[3]  Prior to her death, Elaine Steinbeck held a one-half interest in the statutory termination rights under 17 U.S.C. § 304(c)(2)(A).

> (5) Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant.

17 U.S.C. § 304(c).

This termination right provides authors or their statutory heirs with an opportunity to recapture some of the additional value produced by the lengthened copyright term. See H.R. Rep. No. 94-1476, at 140 (1976). It is worth noting that section 304(c), by its terms, does not apply to grants of a transfer or license of the renewal copyright made on or after January 1, 1978. Such grants are subject to the slightly different termination right provided at 17 U.S.C. § 203, which, among other distinctions, applies only to grants made by the author rather than to grants made by either the author or other parties.

Section 304(c) also provides only a limited five-year window of time "beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later," 17 U.S.C. § 304(c)(3), during which termination rights may be exercised. If the termination right is not exercised during this window, the original grant remains in effect. So, for Cup of Gold, the earliest work included in the 1938 Agreement, the termination right under section 304(c) expired on August 2, 1990, and for The Grapes of Wrath, the latest work, the right expired on April 14, 2000. It is

9

undisputed, however, that no termination right under section 304(c) was ever exercised with respect to the copyrights covered by the 1938 Agreement.

When the length of the copyright term was extended in 1998, Congress provided an additional window of time corresponding to this extension, during which the same termination right could be, had it not already been, exercised. See 17 U.S.C. § 304(d). For pre-1978 grants whose section 304(c) termination right, as of October 26, 1998, had expired without being exercised, termination could "be effected at any time during a period of 5 years beginning at the end of 75 years from the date copyright was originally secured." Id. Section 304(d) otherwise incorporated the conditions specified in section 304(c) including the statutory heirs of an author's termination right. See 17 U.S.C. § 304(d)(1). The Notice of Termination issued in 2004 by the Steinbeck Descendants purported to terminate the 1938 grants of copyright licenses within each work's section 304(d) termination period.

District Court Proceedings

Upon receiving the Termination Notice, Penguin filed a complaint in the United States District Court for the Southern District of New York seeking a declaratory judgment against Thomas Steinbeck and Blake Smyle that the notice is invalid. Penguin argued that the 1994 Agreement, to which Elaine Steinbeck was a party, superseded and itself terminated the 1938 Agreement, and that there was therefore no pre-1978 grant of a transfer or

10

license of the renewal copyright to which section 304(d) could be applied.

In a related action, initiated by the Steinbeck Descendants, the estate and heirs of Elaine Steinbeck filed counterclaims seeking an equivalent declaration. The district court consolidated the two actions for the purposes of the summary judgment motions.

In an order issued June 8, 2006 and amended July 18, 2006, the district court disagreed, granting summary judgment against Penguin and Elaine Steinbeck's heirs and, among other things, upholding the validity of the Termination Notice served by the Steinbeck Descendants in 2004. Steinbeck v. McIntosh & Otis, Inc., 433 F. Supp. 2d 395, 401 (S.D.N.Y. 2006). The court rejected Penguin's argument that the 1994 Agreement extinguished the section 304(d) termination right, observing that the agreement explicitly contemplated the future exercise of termination rights and that it did not grant Penguin rights that were any greater or less than those granted by the 1938 Agreement. Id. The court also concluded that "to the extent that the 1994 Agreement would strip [the Steinbeck Descendants] . . . of their inalienable termination rights in the pre-1978 grants, it is void as an 'agreement to the contrary' pursuant to 17 U.S.C. § 304(c)(5)." Id. at 402 (footnote omitted). In the district court's view, "[a]ny interpretation of the 1994 Agreement having the effect of disinheriting the statutory heirs to the termination interest -- [the Steinbeck Descendants] -- in

11

favor of Elaine's heirs must be set aside as contrary to the very purpose of the termination statute . . . ." Id. at 402 n.23.

Penguin, and the estate and heirs of Elaine Steinbeck, appeal from the portion of the district court's judgment addressing the validity of the 2004 Termination Notice as to those works covered by the 1938 Agreement.

## DISCUSSION

### I.  Standard of Review

"We review de novo a district court's ruling on cross-motions for summary judgment, in each case construing the evidence in the light most favorable to the non-moving party." White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 167 (2d Cir. 2007).

### II.  Whether the 1994 Agreement Terminated and Superseded the 1938 Agreement

The Copyright Act provides a termination right for the grant of a transfer or license of copyright made by parties other than the author only if the grant was made prior to January 1, 1978.  17 U.S.C. § 304(d).  Our first inquiry, then, is whether the 1994 Agreement terminated and superseded the 1938 Agreement. We conclude that it did, leaving in effect no pre-1978 grants to which the termination rights provided by section 304(d) could be applied.

The language of the 1994 Agreement makes clear that the parties intended that the 1938 Agreement be terminated.  Under

12

New York law,[4] "parties to an agreement can mutually agree to terminate it by expressly assenting to its rescission while simultaneously entering into a new agreement dealing with the same subject matter." Jones v. Trice, 202 A.D.2d 394, 395, 608 N.Y.S.2d 688, 688 (2d Dep't 1994). Once terminated and superseded, the new contract provides all of the parties' obligations and remedies for breach. See Northville Indus. Corp. v. Fort Neck Oil Terminals Corp., 100 A.D.2d 865, 867, 474 N.Y.S.2d 122, 125 (2d Dep't 1984) ("[W]here the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement." (internal quotation marks omitted)). The 1994 Agreement states that "[t]his agreement, when signed by Author and Publisher, will cancel and supercede the previous agreements, as amended, for the Works #1 - #19 [including those works governed by the 1938 Agreement] covered hereunder." We see no valid reason to disregard this language and to regard the 1938 Agreement as surviving the 1994 Agreement.

Contrary to the district court's observation that "[a]t no point did Penguin lose or gain any rights other than those originally granted to it under the 1938 Agreement," Steinbeck, 433 F. Supp. 2d at 401-02, the 1994 Agreement obligated Penguin

---

[4] The parties do not dispute that New York state law governs both the 1938 and 1994 Agreements.

to pay larger guaranteed advance payments and royalties calculated from the "invoiced retail price of every copy sold by the Publisher," rather than "the amount which the Publishers charge for all copies sold."  The 1994 Agreement also modifies the geographic limits of the publication rights as to the covered works and imposes a requirement on Penguin to keep a greater number of Steinbeck works in print.

The district court correctly observed that the 1938 Agreement, by its terms, "was to continue for as long as the publishers keep the works 'in print and for sale,'" Steinbeck, 433 F. Supp. 2d at 402 n.22, but this has little relevance to our analysis.  A contract that remains in force may still be terminated and renegotiated in exchange for, among other things, one party's forbearance of her legal right, such as a statutory right to terminate a previous grant of a copyright transfer or license.  See, e.g., Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 573 (2d Cir. 1991) ("[F]orbearance to assert a valid claim, if bargained for, is sufficient consideration to support a contract.").

It is of similarly little relevance that the 1994 Agreement might have intended that earlier created termination rights survive it, for our central inquiry is not the parties' intent to preserve these rights -- which are granted by statute, not contract -- but rather their intent to terminate the 1938 Agreement.  The availability of termination rights under the Copyright Act is not dependent on the intent of the parties but

14

on, among other things, the date that a grant of rights was executed and the relationship to the author of those seeking to exercise the termination right.  So, even if we accept that the 1994 Agreement "explicitly carries forward possible future termination," Steinbeck, 433 F. Supp. 2d at 401, it does not matter inasmuch as the pre-1978 grant of rights no longer existed.  To the extent that the 1994 Agreement might have also contemplated the potential preservation of termination rights, it does not abrogate the 1994 Agreement's clear expression of intent to terminate all prior grants of a transfer or license in the subject copyrights.

We also reject the suggestion that, notwithstanding the plain language of the 1994 Agreement, there was no effective termination of the 1938 Agreement because the 1994 Agreement provided no opportunity -- no "moment of freedom" -- for those holding the termination right to renegotiate the terms of the grant.  Appellees draw support for this theory primarily from Nimmer on Copyright § 11.07 (6th ed. 1978), referring to 17 U.S.C. § 304(c)(6)(D).  That statutory provision reads:

> A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination. As an exception, however, an agreement for such a further grant may be made between the author or any of the persons provided by the first sentence of clause (6) of this subsection, or between the persons provided by subclause (C) of this clause, and the original grantee or such grantee's successor in title, after the notice of termination has

15

been served as provided by clause (4) of this subsection.

Id. (emphasis added). The appellees read the phrase "only if it is made after the effective date of the termination" to require a period of time during which holders of a termination right "know they will be free of extant agreements and can negotiate for the terminated rights." Appellees' Br. at 80; see also Nimmer on Copyright § 11.07. But the next sentence in the statute provides an exception for the original grantee, who may execute a new grant any time after the notice of termination has been served -- no "moment of freedom" is required.

In any event, nothing in section 304(c)(6)(D) prevents renegotiation of a prior grant where a notice of termination has not been served. Such a succeeding grant of rights would presumably take place with the parties' knowledge that the holder of a termination right could exercise that right if they failed to reach a new agreement. It is undisputed that no termination right was exercised prior to the 1994 Agreement, but Elaine Steinbeck did renegotiate and cancel the 1938 Agreement while wielding the threat of termination. Indeed, this kind of renegotiation appears to be exactly what was intended by Congress. See Section III, supra.

Because we conclude that the 1994 Agreement terminated and superseded the 1938 Agreement, it also eliminated the right to terminate the grants contained in the 1938 Agreement under sections 304(c) and (d).

16

**III. Whether the 1994 Agreement is an "Agreement to the Contrary" under 17 U.S.C. § 304(c)(5)**

The Copyright Act provides that "[t]ermination of the grant [of transfer or license rights] may be effected notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5). The 1994 Agreement is not invalid as an "agreement to the contrary" -- and the Steinbeck Descendants' termination right under section 304(d) is therefore no longer effective -- even if the agreement had the effect of eliminating a termination right that Congress did not provide until 1998.

We do not read the phrase "agreement to the contrary" so broadly that it would include any agreement that has the effect of eliminating a termination right. To do so would negate the effect of other provisions of the Copyright Act that explicitly contemplate the loss of termination rights. For example, sections 304(c) and (d) require only the consent of a simple majority in interest for the exercise of a termination right. Once the termination right is extinguished, it is extinguished with respect to all parties holding a termination interest, whether or not they agreed to its exercise. See 17 U.S.C. § 304(d) (providing a new termination right but only "where the author or owner of the termination right has not previously exercised such termination right"). Similarly, if a termination right expires without being exercised, the original grant is no longer subject to termination, and the Copyright Act specifically provides that in such a case a grant would

17

"continue[] in effect for the remainder of the extended renewal term."  17 U.S.C. § 304(c)(6)(F).  If the holders of a majority of an author's termination interest were to agree that they would not exercise their termination rights, this would have the effect of eliminating a termination right as to the minority termination interests.  Yet such an agreement could not be held ineffective as an "agreement to the contrary" inasmuch as section 304 itself contemplates elimination of termination rights in that manner.

Moreover, the 1994 Agreement did not divest the Steinbeck Descendants of any termination right under section 304(d) when the parties entered into that agreement.  In 1994, only 17 U.S.C. § 304(c) provided a termination right -- section 304(d) would not become effective for another four years.  It is undisputed that the Steinbeck Descendants could not have exercised their termination rights in 1994 because they lacked more than one-half of the author's termination interest.  As of 1994, then, the agreement entered into by Elaine Steinbeck did not deprive the Steinbeck Descendants of any rights they could have realized at that time.  None of the parties could have contemplated that Congress would create a second termination right four years later.  Had Elaine Steinbeck not entered into the 1994 Agreement, the section 304(c) termination right would have expired,[5] and Penguin would have been bound only by the 1938

_____

[5]  There is some question as to why Penguin agreed to terminate and renegotiate the 1938 Agreement, for without a majority termination interest, it appears that Elaine Steinbeck would have been unable to terminate the 1938 Agreement on her own.  Although she possessed a power of attorney to exercise the

18

Agreement for the duration of the copyright terms absent (as ultimately happened) Congressional action. We cannot see how the 1994 Agreement could be an "agreement to the contrary" solely because it had the effect of eliminating termination rights that did not yet exist.

Appellees' reliance on Marvel Characters, Inc. v. Simon, 310 F.3d 280 (2d Cir. 2002), is misplaced. There, the parties entered into a settlement agreement that contractually recharacterized an already created work as a "work made for hire." Works for hire are exempt from section 304(c) and (d). We agreed with the author that the grantee could not use such after-the-fact relabeling of the nature of the work to eliminate a future exercise of the author's termination right under section 304(c), because the contract constituted an "agreement to the contrary" that left termination rights unaffected under section 304(c)(5). Id. at 290. We were concerned that if such an agreement was not held to be an ineffective "agreement to the contrary," authors could be coerced into recharacterizing works already created as works for hire so as to avoid subsequent application of a section 304 termination right. Marvel concludes only that backward-looking attempts to recharacterize existing grants of copyright so as to eliminate the right to terminate

Steinbeck Descendants' termination rights as a result of a 1983 settlement, it is unclear that her exercise of those rights would have been valid. But the resolution of these speculations is immaterial to the resolution of this appeal.

under section 304(c) are forbidden by section 304(c)(5).  There was no such attempt at recharacterization here.

There is also no indication in the statutory text or the legislative history of the Copyright Act that elimination of a termination right through termination of a pre-1978 contractual grant was to be precluded or was undesirable.  The House Report for the 1976 amendments noted, for example, that "nothing in [the Copyright Act] is intended to change the existing state of the law of contracts concerning the circumstances in which an author may cancel or terminate a license, transfer, or assignment." H.R. Rep. No. 94-1476, at 128 (1976).  The report also noted more specifically that "parties to a transfer or license" would retain under the amendments the continued right to "voluntarily agree[] at any time to terminate an existing grant and negotiat[e] a new one."  Id. at 127.  So, provided that a post-1978 agreement effectively terminates a pre-1978 grant, Congress did not manifest any intent for the earlier agreement to survive simply for purposes of exercising a termination right in the future. See Milne v. Stephen Slesinger, Inc., 430 F.3d 1036, 1046 (9th Cir. 2005) (post-1978 agreement superseding pre-1978 agreement was of "the type expressly contemplated and endorsed by Congress" because it enabled an author's statutory heirs to renegotiate the terms of an original grant with full knowledge of the market value of the works at issue), cert. denied, 548 U.S. 904 (2006).[6]

[6] We note that the passages quoted above concern the termination provision that applies to post-1978 grants, rather than the termination provisions here at issue.  The Supreme Court

It should be noted that under our view, authors or their statutory heirs holding termination rights are still left with an opportunity to threaten (or to make good on a threat) to exercise termination rights and extract more favorable terms from early grants of an author's copyright. But nothing in the statute suggests that an author or an author's statutory heirs are entitled to more than one opportunity, between them, to use termination rights to enhance their bargaining power or to exercise them. See 17 U.S.C. § 304(d) (permitting exercise of termination right only "where the author or owner of the termination right has not previously exercised such termination right"). In this case, Elaine Steinbeck had the opportunity in 1994 to renegotiate the terms of the 1938 Agreement to her benefit, for at least some of the works covered by the agreement were eligible, or about to be eligible, for termination. By taking advantage of this opportunity, she exhausted the single opportunity provided by statute to Steinbeck's statutory heirs to revisit the terms of her late husband's original grants of licenses to his copyrights. It is no violation of the Copyright Act to execute a renegotiated contract where the Act gives the

has described the two provisions, however, as "comparable," Mills Music, Inc. v. Snyder, 469 U.S. 153, 173 n.39 (1985), and indeed they both contain the "agreement to the contrary" clause. "The normal rule of statutory construction [is] that identical words used in different parts of the same Act are intended to have the same meaning." Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 562 (1995); see also Milne v. Stephen Slesinger, Inc., 430 F.3d 1036, 1046 (9th Cir. 2005) ("To the extent that the legislative record references section 304(c)(5)'s counterpart provision under section 203(a)(5), we find that history instructive given Congress's use of identical language in both provisions.").

original copyright owner's statutory heirs the opportunity and incentive to do so.  See Milne, 430 F.3d at 1046; cf. Classic Media, Inc. v. Mewborn, ___ F.3d ___, 2008 WL 2697798, 2008 U.S. App. LEXIS 14755 (9th Cir. July 11, 2008) (termination right preserved, notwithstanding a March 1978--i.e. post-1978--grant of rights, where termination right could not have been exercised until 1984 at the earliest, and where "[n]either party intended to revoke and replace (or even modify)" a 1976 grant of rights).

The 1994 Agreement was not an "agreement to the contrary" rendered ineffective by section 304(c)(5).

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is reversed and the case remanded for entry of judgment in favor of Penguin.