RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JACKSON S. BRUMLEY; ALBERT E. BRUMLEY, JR.;
ROLENE M. BRUMLEY; ANGELA WILHOITE; W.J.
BRUMLEY; KRISTI BRUMLEY LAXTON; MARK
BRUMLEY; KERI BRUMLEY PILCHER,

         *Plaintiffs-Appellees,*

      *v.*

ALBERT E. BRUMLEY & SONS, INC.; INTEGRATED
COPYRIGHT GROUP, INC.; ROBERT B. BRUMLEY,

         *Defendants-Appellants.*

No. 15-5429

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:08-cv-01193—Aleta Arthur Trauger, District Judge.

Argued: April 20, 2016

Decided and Filed: May 16, 2016

Before: SILER, SUTTON, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Barry I. Slotnick, LOEB & LOEB LLP, New York, New York, for Appellants. Larry L. Crain, CRAIN, SCHUETTE & ASSOCIATES, LLC., Brentwood, Tennessee, for Appellees. **ON BRIEF:** Barry I. Slotnick, Jonathan N. Strauss, Brittany Schaffer, LOEB & LOEB LLP, New York, New York, for Appellants. Larry L. Crain, CRAIN, SCHUETTE & ASSOCIATES, LLC., Brentwood, Tennessee, for Appellees.

1

—————————

**OPINION**

—————————

SUTTON, Circuit Judge.  Albert Brumley, author of the gospel song "I'll Fly Away," assigned the song's copyright to his son Robert.  That is something federal copyright law allows.  During the term of a copyright, an author has relatively free rein:  He may use it himself, he may assign or sell it to someone else, or he may license it to another.  *See* 17 U.S.C. § 201(d).

Robert may have thought that he would retain control of the copyright as long as it (and he) existed.  Federal copyright law says otherwise.  One of "the more unusual provisions in the Copyright Act," 3 Patry on Copyright § 7:42 (2016), allows songwriters (or their descendants) to terminate the songwriter's assignment of a copyright to another party, *see* 17 U.S.C. §§ 203, 304(c).  Termination allows the descendants to reap anew the profits from the copyright, a fruitful option if the author's work increases in value over time.  Four of Brumley's six children now attempt to terminate his assignment to their brother, Robert.  Because the four children have complied with the Copyright Act in exercising this right, we (like the district court) uphold their termination.

I.

A.

Congress enacted the first relevant Copyright Act in 1909.  *See* Pub. L. No. 60-349, 35 Stat. 1075 (1909).  The Act established an initial copyright term of twenty-eight years and allowed an author to renew the copyright for an additional twenty-eight years.  *Id.* §§ 22, 23.  If the author sold the copyright to someone else, only the author or his surviving spouse and children had the power to renew the copyright.  That meant that, if "the author s[old] his copyright outright to a publisher for a comparatively small sum" and "the work prove[d] to be a great success," the author had the "exclusive right . . . to take the renewal term."  H.R. Rep. No. 60-2222, at 14 (1909); *see Stewart v. Abend*, 495 U.S. 207, 218–19 (1990).

But could an author bargain away this "exclusive" right to renewal? Yes, the Supreme Court answered, because "the Copyright Act of 1909 does not nullify agreements by authors to assign their renewal interests." *Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 657 (1943). And that was true even if the author sold or assigned the renewal right at the same time that he assigned the copyright during the initial copyright term. *Id.* at 645–47.

Congress had other ideas. It authorized the Copyright Office of the Library of Congress to prepare a study. *See* Copyright Office, Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law at ix (1961). The report concluded that the 1909 renewal provision was designed to allow the renewal copyright to revert to an author so that he "could negotiate new contracts for the further exploitation of the work." *Id.* at 53. But the renewal provision had "largely failed to accomplish its primary purpose" and resulted in much "confusion and litigation." *Id.* The report laid out an assortment of possible solutions, including placing "certain limitations on the transfer of all rights." *Id.* at 93.

Through the 1976 Act, effective in 1978, Congress did just that. *See* Pub. L. No. 94-553, 90 Stat. 2541 (1976). It created a "termination right" that allows an author to undo a prior transfer of his copyright and recapture all interests in the copyright for himself. If the work was transferred in 1978 or later, the author could terminate the transfer between thirty-five and forty years after the date the copyright was assigned to a third party. *See* 17 U.S.C. § 203(a)(3). If the work was copyrighted and transferred before 1978, however, a different set of provisions kicked in, with a timeline tied to the date the copyright was obtained. The author (or his successors as provided by the Act) could terminate between fifty-six and sixty-one years after the work was copyrighted, or for a period of five years after January 1, 1978, whichever was later. *Id.* § 304(c)(3).

At the same time it created these termination rights, the 1976 Act abolished the copyright renewal provision. *See id.* § 302(a). That meant a copyright would last longer than it would under the 1909 Act, but it could never be renewed. Congress replaced the confusing and misinterpreted renewal provision with a new one: termination.

In 1998, Congress increased the length of the copyright term by an additional twenty years and provided a tandem termination right. *See* Pub. L. No. 105-298, § 102, 112 Stat 2827, 2827–28 (1998). This termination right mirrors the 1976 Act's application to pre-1978 transfers. It merely provides an additional term during which the author may terminate: between seventy-five and eighty years after the copyright was obtained. 17 U.S.C. § 304(d)(2).

Through the 1976 and 1998 Acts, Congress hoped to succeed where the 1909 Act had failed. Termination would help "relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172–73 (1985). Say a no-name author writes a quirky tale about a boy wizard with a scar on his forehead and assigns the rights for a song to a big publisher. Either § 203 or § 304 (depending on when she wrote and transferred the work) would allow her to get the rights back and renegotiate a new contract for better returns.

All agree that this is a one-shot deal. An author may exercise this termination right just once. Say a nun writes a memoir about her life—becoming a governess for six children, falling in love with their widowed father, and escaping from Nazi-occupied Austria—and assigns the rights to the story for a pittance. Under current law, she could terminate the assignment of the memoir after the story formed the basis for a successful Broadway musical. But she could not terminate a second assignment of the memoir if the story later became the basis for an even more successful movie.

B.

In the late 1920s, Albert Brumley composed the song "I'll Fly Away," a gospel spiritual celebrating death and resurrection, while he worked in the Oklahoma cotton fields. "Some glad morning when this life is o'er / I'll fly away / To a home on God's celestial shore / I'll fly away," the song goes. Johnny Cash and Alison Krauss have covered the song, as have many others, and it can be heard on many a Sunday morning. Brumley sold his creation to a music publishing company, which copyrighted the song in 1932. In the late 1940s, Brumley purchased the company, bringing the song and its copyright home. Brumley at that point started a music

publishing company of his own called "Albert E. Brumley & Sons." R. 201 at 2. In 1975, Brumley and his wife Goldie sold Brumley & Sons (fittingly) to two of his sons, William and Robert, for $100,000, "assign[ing] and transfer[ring] . . . all of [the couple's] right title and interest" in the song. App. 73.

Brumley died in 1977. Robert and William apparently sought to shore up their status as owners of the song's copyright. In May 1979, they obtained from Goldie a "BILL OF SALE AND ASSIGNMENT." *Id.* at 76. It stated that "in consideration of One Dollar . . . and other good and valuable considerations," Goldie "assigned and transferred . . . all the right, title and interest . . . in . . . all rights to obtain renewals or copyrights in the future upon Works written or composed by . . . Albert E. Brumley" to Brumley & Sons. *Id.* Robert bought out William's interest in Brumley & Sons in 1986 for $246,500, becoming the sole owner of the copyright.

Goldie died in 1988. Twenty years later, a sibling spat arose, tied (of all things) to the royalties from a gospel song. In April 2008, Albert, Jr., Betty, Jackson, and Thomas—four of Brumley's children—served a termination notice on their brother, Robert, to share in the lucrative rights in "I'll Fly Away," which appears to generate roughly $300,000 a year in royalties. The idea was to cut off Robert's exclusive rights to the copyright and to permit all of the siblings to profit equally from the song. The termination notice purported to undo the 1975 assignment in which Brumley and his wife sold Brumley & Sons—and with it, the rights to the song—to William and Robert. The four siblings recorded the termination notice with the U.S. Copyright Office shortly after serving it on Robert. (Some of the siblings have since passed away, but their spouses and children have carried on with the litigation.)

In December 2008, the four siblings filed this lawsuit against Robert and Brumley & Sons, seeking a declaration that their termination notice was effective. Robert and the company responded with two key defenses: (1) Albert's song was a "work made for hire," which is not eligible for termination, 17 U.S.C. § 304(c); and (2) Goldie relinquished any termination rights in the 1979 assignment to Robert and William. The district court ruled as a matter of law that Goldie did not extinguish the family's termination rights in 1979 and presided over a jury trial on the work-made-for-hire question. After the jury ruled in favor of the four siblings, Robert and the company appealed, challenging certain evidentiary rulings. Our court reversed and required

a new trial. *Brumley v. Albert E. Brumley & Sons, Inc.*, 727 F.3d 574, 580 (6th Cir. 2013). The second trial ended the same way—in favor of the four siblings. Robert appealed, challenging the district court's interpretation of the 1979 assignment but not the jury's finding that "I'll Fly Away" was not a work made for hire.

## II.

Because Albert transferred "I'll Fly Away" before 1978, the termination provisions in § 304 of the Copyright Act govern. "In the case of any copyright subsisting in either its first or renewal term on January 1, 1978," they say, "the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, . . . otherwise than by will, is subject to termination." 17 U.S.C. § 304(c); *see id.* § 304(d).

The termination provision has two salient features. One is that, so long as the author never exercised the termination right, it survives him. His "widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest" and "the ownership of one-half of the author's interest is divided among the [surviving children and grandchildren]." *Id.* § 304(c)(2). When there is no surviving spouse, "[t]he author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest." *Id.* § 304(c)(2)(B). In order to terminate, a group that is "entitled to exercise a total of more than one-half of [the] author's termination interest" must agree to the termination, give advance notice of the termination, and file everything within one of two windows of time. *See id.* § 304(c)(1), (c)(3), (c)(4), (d).

The other key feature of the termination right is that, at a minimum, agreements predating 1978 that purport to bargain away all rights in a copyrighted work may not limit the termination right. Else, the purpose of transforming the "renewal right" regime into a "termination right" regime would be thwarted. In the words of the statute: "Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant." *Id.* § 304(c)(5).

All of this means that, once Goldie passed away, each of the Brumley siblings held a one-sixth interest in the termination right, even though Robert and William held all of the rights to the copyright. It means the four siblings could exercise two-thirds of the termination interest with respect to a pre-1978 assignment—Brumley's 1975 sale to two of his sons—as allowed under the 1976 Act. *See id.* § 304(c)(6). And it means that, when the four siblings agreed to the termination, they complied with the timeline, majority-share prerequisites, and other requirements established by the Act.

Or so it seems. What makes this case difficult is less a matter of statutory interpretation and more a matter of contract interpretation, namely the meaning of Goldie's 1979 assignment to William and Robert. Recall what happened in May of 1979: Through a "BILL OF SALE AND ASSIGNMENT" and "in consideration of One Dollar . . . and other good and valuable considerations," Goldie "assigned and transferred . . . all the right, title and interest . . . in . . . all rights to obtain renewals or copyrights in the future upon Works written or composed by . . . Albert E. Brumley" to Brumley & Sons, which William and Robert owned. App. 76. Notably, the parties do not argue that, as of 1979, Goldie had no authority to sell her termination right to her two sons under the copyright laws. They assume, as have two other courts of appeals, that the 1976 Act's prohibition on such assignments—making termination rights enforceable "notwithstanding any agreement to the contrary," 17 U.S.C. § 304(c)(5)—applies only to pre-1978 agreements that could be construed to cut off a termination right. *See Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 202–04 (2d Cir. 2008); *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1043–45 (9th Cir. 2005).

What matters, then, is what the 1979 agreement did—and did not do. Consistent with the district court's ruling, we interpret that agreement not to bargain away Goldie's termination right and not to replace the 1975 contract. Her termination right thus went to her children when she died in 1988, and the 1979 document does not stop the siblings' termination.

Robert offers several rejoinders. *First*, he argues that Goldie's 1979 document "effectively . . . . exercise[d] [her] termination interest[]." Appellants' Br. 26. But Goldie never exercised her termination right because the Copyright Act does not allow the sort of unofficial termination that Robert proposes. The Act and its implementing regulations describe several

requirements of a termination notice, including that it must "state the effective date of the termination" and "be recorded in the Copyright Office."  17 U.S.C. § 304(c)(4)(A); *see also* 37 C.F.R. § 201.10.  Goldie's 1979 assignment did none of this.  It does not give a termination date.  It was never recorded with the Copyright Office.  It does not even mention the word "termination."

Even if that had not been the case, Goldie would have lacked the right to terminate on her own.  In 1979 Goldie held a one-half share of the termination right because the other half passed in equal shares to the children when Albert died.  17 U.S.C. § 304(c)(2)(A).  Only those who "are entitled to exercise a total of more than one-half of [the] termination interest" may terminate.  *Id.* § 304(c)(1).  She thus could not have terminated the 1975 grant in 1979 without at least one of her children joining her.  None did.  The 1979 contract does not amount to a termination notice.

Robert persists that, even if the 1979 document did not amount to a termination notice, (1) Goldie held 50% of the termination right in 1979, and (2) Goldie bargained away that termination right in the 1979 document, which means that any partial termination right that the four siblings now have does not suffice to terminate under the Act.  The first premise of this argument is correct.  *See id.* § 304(c)(3), (4)(a).  The second premise is not.  The 1979 document never mentions termination rights, even after the 1976 Act made them, as opposed to renewal rights, the brass-ring authority that authors, their spouses, and their heirs could invoke to capture latent value in a work.  The brief language of the 1979 document indeed nearly mirrors the assignment language of the 1975 assignment, which of course did not transfer any termination rights—because the concept did not yet exist and at any rate would not have been enforceable in view of the 1976 Act's prohibition on prior "agreement[s] to the contrary."  Last of all, the 1979 assignment does not purport to override the 1975 assignment, leaving a pre-1978 copyright agreement that could be terminated under the 1976 Act.

*Second*, Robert leans on cases from other circuits.  They do not help.  In *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, the Ninth Circuit confronted a situation that at first glance looks similar to ours.  430 F.3d 1036 (9th Cir. 2005).  A.A. Milne assigned an assortment of copyrights in works related to "Winnie the Pooh" to Slesinger in 1930.  In 1983, Milne and

Slesinger's successors in interest renegotiated the contract, "provid[ing] for the revocation of the 1930 . . . agreement[] in favor of the new agreement." *Id.* at 1040. The Ninth Circuit held that, because the 1983 grant replaced the 1930 grant, the 1930 grant could not be terminated. *Id.* at 1048. The Ninth Circuit reached a similar conclusion in *DC Comics v. Pacific Pictures Corp.* It held that "as a matter of New York law," a later contract "superseded" the prior one, "and therefore operated to revoke that assignment and re-grant the . . . copyrights." 545 F. App'x 678, 680 (9th Cir. 2013).

The key difference between *Milne* and *DC Comics* on the one hand and today's case on the other is that the pre-1978 assignments in those cases were clearly revoked by the post-1978 assignments. Because the earlier contracts no longer existed, they could not be terminated. That is a far cry from our case, in which the 1975 contract remained alive and well—and subject to termination—at the time of termination.

*Penguin Group (USA) Inc. v. Steinbeck* is of a piece. 537 F.3d 193 (2d Cir. 2008). John Steinbeck's descendants sought to terminate some pre-1978 copyright assignments. But a post-1978 agreement stated that it "cancel[ed] and supersede[d] the previous agreements." *Id.* at 200. "Because . . . the [post-1978] Agreement terminated and superseded the [pre-1978] Agreement"—and thus had already allowed the author's descendants to profit from the growing commercial success of their progenitor—the pre-1978 agreement could not be terminated. *Id.* at 202. By contrast, Goldie's 1979 document by its terms does not replace the 1975 contract. It indeed never mentions the 1975 contract at all, much less mentions the sale of any termination rights.

*Third*, Robert maintains that state contract law (the law of Missouri, the parties agree) establishes that the 1979 document amounts to a second contract that supersedes the 1975 agreement. Otherwise, what was the point of the 1979 agreement? It must have done something, he says, pointing out the reluctance under Missouri law (and the law of other States) to interpret a contract to do nothing. This is a fair point, but it runs into another fair point. If there is one thing clear about the 1976 Copyright Act (and its 1998 addendum), it is that Congress sought to permit authors and their heirs to capture latent value in copyrights; hence the replacement of the flawed renewal regime with the termination right regime. Even if, as the

parties seem to assume, an author or heir may contract away (or extinguish) a termination right after 1978, we should not lightly assume that a contract bargains away this centerpiece feature of the 1976 Act. When "there [is no] evidence in the record to support a finding that [a party] . . . considered [its] termination rights under § 304(c), or . . . intended to waive or relinquish them," *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 989 (9th Cir. 2008), courts should presume that a post-1978 agreement did not bargain away any termination rights.

The 1979 agreement, characterized most prominently by what it does not say, fails to contract away or extinguish termination rights. Entered into one year after the 1976 Act became effective, it says nothing about termination rights, says nothing about the existing 1975 agreement, and says nothing about replacing the 1975 agreement.

That the 1979 assignment has additional terms, moreover, does not mean it replaces the 1975 agreement. Missouri novation law tells us as much. Novation occurs when "a new contract or obligation" is substituted "for an old one which is thereby extinguished." *W. Crawford Smith, Inc. v. Watkins*, 425 S.W.2d 276, 279 (Mo. Ct. App. 1968). A party attempting to prove that a later contract has replaced an earlier one must show "extinguishment of the old contract." *Am. Nat'l Ins. Co. v. Noble Commc'ns Co.*, 936 S.W.2d 124, 131 (Mo. Ct. App. 1996). Novation "is never presumed," and "[t]he controlling element in determining whether a novation has been accomplished is the intention of the parties." *Watkins*, 425 S.W.2d at 279. Nothing in the 1979 document, which never mentions the 1975 agreement, indicates that it extinguished the 1975 agreement.

What then, Robert insists, did the 1979 assignment do? Here is one possibility. The 1975 agreement assigned "all of [the] right[,] title[,] and interest," App. 74, to "I'll Fly Away," while the 1979 agreement elaborated that it did the same for "[a]ll copyright renewals" and "all rights to obtain renewals or copyrights in the future," *id.* at 76. The broader language in the 1979 agreement would cover royalties on derivative works and future renewals permitted by Congress—which gives the 1979 agreement some meaning, even if not the meaning Robert would prefer. Either way, the language of the 1979 agreement did not suffice to eliminate/exercise/terminate Goldie's termination right.

The alert reader may wonder why we decline to reject Robert's defense on another ground—that the 1979 agreement, if construed to assign or extinguish Goldie's termination rights, would amount to an impermissible "agreement to the contrary." 17 U.S.C. § 304(c)(5) (In full: "Termination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement to make a will or to make any future grant."). Two answers: The siblings have not argued the point, and it would not affect the outcome anyway given our interpretation of the 1979 agreement. The parties appear to accept the decisions of the Second and Ninth Circuits that termination rights, once vested after 1978, may be extinguished or bargained away. *See Steinbeck*, 537 F.3d at 204; *Milne*, 430 F.3d at 1044–45. While the caselaw on this issue appears to be one-sided, it deserves mention that *Nimmer on Copyright*, now a father-son treatise that seems to have cornered the market on copyrights for works about copyright law, takes a contrary view. *See* M. Nimmer & D. Nimmer, 3 *Nimmer on Copyright* § 11.07[A] (2015); *see also* Peter S. Menell & David Nimmer, *Pooh-Poohing Copyright Law's 'Inalienable' Termination Rights*, 57 J. Copyright Soc'y U.S.A. 799, 824–25 (2010).

*Fourth*, Robert claims that the district court made a mistake by failing to address his arguments related to his brother William's termination interests. Remember that in 1986, eleven years after Albert Brumley sold Brumley & Sons to Robert and William, Robert bought William's interest in the company for roughly $240,000. Robert claims that the district court should have considered whether William exercised or sold his termination interests when he agreed to the 1986 sale. The district court did not misstep. In the first place, because the four plaintiff siblings owned more than half of the termination right, they may terminate for the whole group under the Copyright Act. *See* 17 U.S.C. § 304(c)(1). In the second place, the 1986 agreement purported only to sell William's shares in the company to Robert. It said nothing about his legislatively created personal termination right, as opposed to his rights as a shareholder. That means that each of the six siblings (or their spouses and children, in appropriate sub-shares) now owns one-sixth of an interest in the copyright of "I'll Fly Away." *See id.* § 304(c)(6).

For these reasons, we affirm.